Filed with Classified

**IN THE UNITED STATES DISTRICT COURT** Information Security Officer
**FOR THE DISTRICT OF COLUMBIA**

CISO _____

Date _____

ABD AL RAHIM HUSSEIN AL NASHIRI,

               *Petitioner,*

v.

DONALD TRUMP, *et al.,*

               *Respondents.*

CIVIL ACTION
(HABEAS CORPUS)

No. 08-Civ-1207 (RCL)
Misc. No. 08-mc-442 (TFH)

*before*
Judge Royce C. Lamberth

### SUPPLEMENTAL PETITION FOR
### A WRIT OF HABEAS CORPUS

# TABLE OF CONTENTS

Table of Authorities .................................................................................................ii

Introduction ..........................................................................................................2

Background ...........................................................................................................5

    A.  Petitioner's initial seizure and custody prior to 2006. .............................5
    B.  Petitioner's post-2006 detention in Guantanamo and subsequent military
        commission proceedings. ........................................................................8
    C.  Prior relevant federal court proceedings................................................22

Reasons for Granting the Writ ...............................................................................24

    I.     Standard of Review...................................................................................24

    II.    Segregating categories of defendants by making personal jurisdiction
    dependent upon citizenship status violates Due Process. ...................................25

        A.  This Court must apply strict scrutiny to the *de jure* segregation of the
            justice system. ..................................................................................26
        B.  Section 948c fails strict scrutiny. ............................................................28
        C.  Making personal jurisdiction contingent upon citizenship status was
            motivated by irrational animus and the desire to avoid political
            accountability. ..................................................................................30

    III.   Respondents cannot meet their burden to show that their military
    commission has personal jurisdiction over Petitioner........................................34

        A.  Military commissions' personal jurisdiction is limited to unprivileged
            enemy belligerents. ............................................................................34
        B.  Respondents cannot meet their burden to show that Petitioner was engaged
            in any hostilities. ...............................................................................36
        C.  If §948c does give a military commission personal jurisdiction over
            Petitioner, then it is unconstitutional. ..................................................48

    IV.   Petitioner is being denied his constitutional, statutory, and regulatory right
    to qualified counsel in a capital case......................................................................52

    V.    None of the claims presented here are subject to the abstention doctrine
    articulated by the D.C. Circuit in *In re: Al-Nashiri*. .........................................56

Prayer for Relief..................................................................................................61

Certificate of Service ...........................................................................................62

# TABLE OF AUTHORITIES

**Cases**

*Al-Nashiri v. MacDonald*,
  741 F.3d 1002 (9th Cir. 2013) .................................................................................................22

*Al-Nashiri v. Obama*,
  76 F.Supp.3d 218 (D.D.C. 2014) .............................................................................................22

*Al-Warafi v. Obama*, No. 09-cv-2368 (RCL),
  2015 WL 4600420 (D.D.C. July 30, 2015) ......................................................................... 25, 37

*Awad v. Obama*,
  608 F.3d 1 (D.C. Cir. 2010) ................................................................................................ 24, 35

*Bahlul v. United States*,
  767 F.3d 1 (D.C. Cir. 2014) .....................................................................................................27

*Bahlul v. United States*,
  840 F.3d 757 (D.C. Cir. 2016) .................................................................................................27

*Bismullah v. Gates*,
  551 F.3d 1068 (D.C. Cir. 2009) ...............................................................................................22

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ........................................................................................................... 22, 24

*Carter v. Halliburton*,
  710 F.3d 171 (4th Cir. 2013).....................................................................................................41

*Caspari v. Bolden*,
  510 U.S. 383 (1994) .................................................................................................................59

*Chapman v. California*,
  386 U.S. 18 (1967) ...................................................................................................................59

*Coleman v. Alabama*,
  399 U.S. 1 (1970).....................................................................................................................54

*Comm. on Oversight & Gov't Reform v. Holder*,
  979 F. Supp. 2d 1 (D.D.C. 2013)..............................................................................................27

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
  508 U.S. 602 (1993) .................................................................................................................24

*Cruzan v. Dir., Mo. Dep't of Health*,
  497 U.S. 261 (1990) .................................................................................................................33

*Department of Agriculture v. Moreno*,
  413 U.S. 528 (1973) .................................................................................................................31

*Ex parte Milligan*,
  4 Wall. 1 (1866) .......................................................................................................................50

*Ex parte Quirin*,
  317 U.S. 1 (1942)................................................................................................................ 29, 50

*Graham v. Richardson*,
   403 U.S. 365 (1971) ....................................................................................................26, 28

*Griffin v. Illinois*,
   351 U.S. 12 (1956) .............................................................................................................26

*Grisham v. Hagan*,
   361 U.S. 278 (1960) ..........................................................................................................50

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ...................................................................................................passim

*Hamdan v. United States*,
   696 F.3d 1238 (D.C. Cir. 2012) .......................................................................................41

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) .............................................................................................24, 28, 34

*Hampton v. Mow Sun Wong*,
   426 U.S. 88 (1976) .............................................................................................................33

*Hussain v. Obama*,
   718 F.3d 964 (D.C. Cir. 2013) .........................................................................................35

*In re Al-Nashiri*,
   835 F.3d 110 (D.C. Cir. 2016) ...................................................................................passim

*In re Guantanamo Bay Detainee Litig.*,
   953 F. Supp. 2d 40 (D.D.C. 2013) ...................................................................................24

*In re Yamashita*,
   327 U.S. 1 (1946) ..................................................................................................24, 47, 50

*Int'l Ass'n of Machinists v. Street*,
   367 U.S. 740 (1961) ..........................................................................................................51

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ....................................................................................................24, 50

*Kinsella v. Singleton*,
   361 U.S. 234 (1960) ..........................................................................................................50

*Korematsu v. United States*,
   323 U.S. 214 (1944) ..........................................................................................................29

*Landry v. F.D.I.C.*,
   204 F.3d 1125 (D.C. Cir. 2000) .......................................................................................55

*Lee v. Madigan*,
   358 U.S. 228 (1959) ..........................................................................................................51

*LSC v. Velasquez*,
   531 U.S. 533 (2001) ..........................................................................................................33

*Mathews v. Diaz*,
   426 U.S. 67 (1976) .............................................................................................................26

*Matthews v. McStea*,
   91 U.S. 7 (1875)...........................................................................................................48

*McElroy v. Guagliardo*,
   361 U.S. 281 (1960) ...................................................................................................50

*McLaughlin v. State of Fla.*,
   379 U.S. 184 (1964) ..........................................................................................25, 29

*Meshal v. Higgenbotham*,
   2015 WL 6405207 (D.C. Cir., Oct. 23, 2015) ...........................................................40

*Mohammed v. Obama*,
   689 F. Supp. 2d 38 (D.D.C. 2009).............................................................................24

*Odah v. United States*,
   611 F.3d 8 (D.C. Cir. 2010) .......................................................................................24

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) ...................................................................................................28

*Penson v. Ohio*,
   488 U.S. 75 (1988) .............................................................................................56, 58

*Plyler v. Doe*,
   457 U.S. 202 (1982) ...................................................................................................26

*Prosecutor v. Boškoski*, Case No. IT-04-82-T,
   Judgment (ICTY Tr. Chamber, Jul. 10, 2008)...............................................44, 46, 47

*Prosecutor v. Haradinaj*, Case No. IT-04-84bis-T,
   Retrial Judgment (I.C.T.Y. Tr. Chamber, Nov. 29, 2012) ........................................47

*Prosecutor v. Tadić*, Case No. IT- 94-1-T,
   Judgment (ICTY Tr. Chamber, May 7, 1997) ...........................................................43

*Prosecutor v. Tadić*, Case No. IT-94-1-AR72,
   Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction
   (ICTY App. Chamber, Oct. 2, 1995)...........................................................39, 43, 45

*Rasul v. Bush*,
   542 U.S. 466 (2004) ...................................................................................................40

*Reid v. Covert*,
   354 U.S. 1 (1957)...................................................................................26, 49, 50, 59

*Romer v. Evans*,
   517 U.S. 620 (1996) ...................................................................................................33

*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) ...................................................................................................56

*Skinner v. Oklahoma ex rel. Williamson*,
   316 U.S. 535 (1942) ...................................................................................................29

*Solina v. United States*,
709 F.2d 160 (2d Cir. 1983)................................................................................................59

*Strickland v. Washington*,
466 U.S. 668 (1984)..........................................................................................................59

*Sulyaman v. Obama*,
729 F. Supp. 2d 26 (D.D.C. 2010)....................................................................................24

*Talbot v Seeman*,
1 Cranch 1 (1801)............................................................................................................37

*The Prize Cases*,
2 Black 635 (1862) ....................................................................................................38, 48

*United States v Pfluger*,
685 F.3d 481 (5th Cir. 2012)............................................................................................41

*United States v. Ali*,
718 F.3d 929 (D.C. Cir. 2013) .........................................................................................25

*United States v. Ash*,
413 U.S. 300 (1973) .........................................................................................................54

*United States v. Davila*,
133 S. Ct. 2139 (2013).....................................................................................................58

*United States v. Decoster*,
624 F.2d 196 (D.C. Cir. 1976) .........................................................................................59

*United States v. Frediani*,
790 F.3d 1196 (11th Cir. 2015) .......................................................................................40

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006) .........................................................................................................58

*United States v. Hamdan*,
801 F.Supp.2d 1247 (USCMCR 2011) ............................................................................27

*United States v. Harper*,
729 F.2d 1216 (9th Cir. 1984) .........................................................................................54

*United States v. Jayyousi*,
657 F.3d 1085 (11th Cir. 2011) .......................................................................................28

*United States v. Juda*,
46 F.3d 961 (9th Cir. 1995)..............................................................................................25

*United States v. Quinones*,
313 F.3d 49 (2d Cir. 2002)...............................................................................................54

*United States v. Robel*,
389 U.S. 258 (1967) .........................................................................................................28

*United States v. Wade*,
388 U.S. 218 (1967) .........................................................................................................54

*United States v. Windsor*,
  133 S.Ct. 2675 (2013) ............................................................................................33

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
  536 U.S. 150 (2002) ...............................................................................................30

*Weaver v. Massachusetts*,
  137 S. Ct. 1899 (2017) ............................................................................................58

*Wong Wing v. United States*,
  163 U.S. 228 (1896) ...............................................................................................30

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ...............................................................................................30

*Younger v. Harris*,
  401 U.S. 37 (1971) ..................................................................................................59


**U.S. Code**

10 U.S.C. § 1544 .............................................................................................................38

10 U.S.C. § 948a .......................................................................................4, 9, 34, 35

10 U.S.C. § 948b ..................................................................................................4, 31

10 U.S.C. § 948c ...........................................................................................passim

10 U.S.C. § 948k .............................................................................................................14

10 U.S.C. § 949a ...........................................................................................passim

10 U.S.C. § 950p ......................................................................................................3, 36

10 U.S.C. 47A § 1807 .....................................................................................................52

50 U.S.C. § 1541 .............................................................................................................38

50 U.S.C. § 1543 ....................................................................................................38, 41


**Congressional Materials**

152 Cong. Rec. .......................................................................................................31, 32

156 Cong. Rec. ...............................................................................................................32

27 Stat. 25 (1892) ...........................................................................................................30

Authorization for Use of Military Force Against Iraq Resolution, Pub. L. 102-1 (1991) ............38

Authorization for the Use of Military Force, Pub. L. 107-40 (2001) .............................38

Authorization for the Use of Military Force for Iraq, Pub. L. 107-243 (2002) .............................38

H.R. Rep. No. 109-664(I)(2006)......................................................................................50

H.R. Rep. No. 2647, 155 Cong. Rec. 24100 (Oct. 7, 2009)...........................................53

Military Commissions Act of 2009, 123 Stat. 2190 ..........................................................9

Multinational Force and Observers Participation Resolution, Pub. L. 97-132 (1981) .................38

Multinational Force in Lebanon Resolution, Pub. L. 98-119 (1983) ..............................38

Supporting peace, security, and innocent civilians affected by conflict in Yemen,
S. Res. 341, 111th Cong. (2009) ..........................................................................43

*The Future of Military Commissions, Hearing of the Senate Armed Services Committee*
(Aug. 2, 2006) ......................................................................................................32

War Powers Resolution, 87 Stat. 555 (1973) ............................................................. 38, 40

**Executive Materials**

Chief of Naval Operations, *Investigation to Inquire into the Actions of USS COLE (DDG 67) in
Preparing for and Undertaking a Brief Stop for Fuel at Bandar at Tawahi (Aden Harbor)
Aden, Yemen on or about 12 October 2000* (Jan. 9, 2001) ..........................................42

Dep't of Def., Law of War Manual (2015) ....................................................... 35, 38, 39

*Letter to Congress Reporting on the Deployment of U.S. Forces in the Multinational Force and
Observers*, 18 Wkly. Comp. Pres. Doc. 349 (March 19, 1982) ..................................39

*Letter to Congressional Leaders on the Global Deployment of United States Combat-Equipped
Armed Forces*, Daily Comp. Pres. Docs., 2015 DCPD No. 201500428 (Jun. 11, 2015) .........40

*Letter to Congressional Leaders on the Persian Gulf Conflict*, 27 Wkly. Comp. Pres. Doc 59
(Jan. 18, 1991) .....................................................................................................39

*Letter to Congressional Leaders Reporting on Efforts in the Global War on Terrorism*, 39 Wkly.
Comp. Pres. Doc. 1247 (Sept. 19, 2003) ................................................. 36, 39, 40, 42

*Letter to Congressional Leaders Reporting on the Commencement of Military Operations
Against Iraq*, 39 Wkly. Comp. Pres. Doc. 348 (Mar. 21, 2003) ................................39

*Letter to Congressional Leaders Reporting on the Deployment of Forces in Response to the
Terrorist Attacks of September 11*, 38 Wkly. Comp. Pres. Doc. 1588 (Sept. 20, 2002) ...........42

*Letter to Congressional Leaders Reporting on the Deployment of United States Forces in
Response to the Attack on the USS COLE*, 36 Wkly. Comp. Pres. Doc. 2482 (Oct. 14, 2000) 41

*Letter to Congressional Leaders Reporting on the Deployments of United States Combat-
Equipped Armed Forces Around the World*, 43 Wkly. Comp. Pres. Doc. 815 (Jun. 18, 2007) 40

*Letter to Congressional Leaders Reporting on United States Efforts in the Global War on
Terrorism*, 39 Wkly. Comp. Pres. Doc. 246 (Mar. 20, 2003) .....................................40

*Letter to Congressional Leaders Reporting on United States Efforts in the Global War on
Terrorism*, 39 Wkly. Comp. Pres. Doc. 346 (Mar. 20, 2003) .....................................42

*Letter to the Speaker of the House of Representatives and the President Pro Tempore of the
Senate*, 37 Wkly. Comp. Pres. Doc. 1447 (Oct. 9, 2001) ..................................... 39, 40

Military Commission Rules of Evidence, Rule 304 ..........................................................9

Remarks of the Attorney General, *Stopping Terrorists Before They Strike: The Justice Department's Power of Prevention* (Aug. 16, 2006) ....................................................31

Rules for Military Commissions, Rule 505 ...............................................................17

Rules for Military Commissions, Rule 506 ...............................................5, 52, 53, 55

*The President's Radio Address*, 36 Wkly. Comp. Pres. Doc. 2464 (Oct. 14, 2000) ................. 3, 41

**Miscellaneous**

60 Minutes, *Inside Guantanamo* (Nov. 3, 2013) ............................................................12

*American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) ...........................................54

Brig. Gen. John Baker, USMC, *Improper Monitoring of Attorney-Client Meetings* (June 17, 2017) .......................................................................................................14

Carol Rosenberg, *Pentagon says glitch triggered Guantánamo war court kill switch*, Miami Herald (Nov. 7, 2017) ...........................................................................11

Carol Rosenberg, *Will CIA comply with Guantánamo judge's order? Agency won't say*, Miami Herald (Apr. 22, 2014) ...........................................................................9

David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Int'l L. 5 (2005) .................................................................................29

I.C.R.C., Commentary: III Geneva Convention Relative to the Treatment of Prisoners of War (1960) ..............................................................................................................30

Int'l Law Ass'n, The Hague Conference: Final Report on the Meaning of Armed Conflict in International Law (2010) ...........................................................................44

Laurie R. Blank & Benjamin R. Farley, *Identifying the Start of Conflict: Conflict Recognition, Operational Realities and Accountability in the Post-9/11 World*, 36 Mich. J. Int'l L. 467 (2015) ..............................................................................................................48

Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II) art. 1, 8 June, 1977, 1125 U.N.T.S. 610 ..............................................................................................44

Rome Statute of the International Criminal Court arts. 8(2)(d), 8(2)(f), U.N. Doc. A/CONF.183/9 (July 17, 1998) ..............................................................................................43

THE HAGUE CONFERENCE: FINAL REPORT ON THE MEANING OF ARMED CONFLICT IN INTERNATIONAL LAW (2010) .......................................................................39

*United States v. al-Badawi, et al.*, No. 98-CR-1023 (S.D.N.Y., unsealed May 15, 2003) .............8

*United States v. Mohammed, et al.*, AE144 (Jul. 13, 2009) .............................................3

## INTRODUCTION

Petitioner is uniquely situated. He is a Saudi national, who was arrested in Dubai in 2002 on suspicion of having a role in the plot to bomb the USS COLE. This bombing occurred in October 2000 off the coast of Yemen. Petitioner was subsequently named as an unindicted co-conspirator in an indictment for that crime that was unsealed in the Southern District of New York in the spring of 2003. He had nothing to do with the attacks of September 11, 2001, the ensuing war in Afghanistan, or any other recognized hostilities.

In every meaningful respect, Petitioner is indistinguishable from individuals like Ahmed Abu Khattala and Mustafa Al-Imam, who are presently standing trial in this Court for their role in the plot to attack the U.S. Consulate in Benghazi, Libya. *United States v. Khattala*, Case No. 14-141 (CRC). Like Khattala and Al-Imam, Petitioner is a criminal suspect in an act of overseas terrorism against the United States that occurred far from any recognized battlefield. And like those individuals, he was initially detained and questioned by intelligence officials. The only thing that distinguishes Petitioner from those individuals is that Respondents tortured him. Petitioner was the second individual taken into the CIA's Rendition, Detention, and Interrogation (RDI) Program, where he was subjected to "extreme physical, psychological, and sexual torture" over the course of four years. (Ex. B ¶12). And so rather than being taken to a district court, as Khattala and Al-Imam have been, Petitioner was taken to Guantanamo and capitally charged in a military commission system that has languished in pre-trial proceedings for the past nine years and is not expected to commence with any trial until, at least, 2020.

By design, the military commissions are a segregated criminal process in which evidence derived from torture is admissible, secrecy is pervasive, and the presiding military commission judges lack any meaningful degree of independence. And due in large part to routine interference

by outside government agencies, this system has proven itself dysfunctional in practice. In the words of the second of the three military judges to have presided over the September 11th trial, the military commissions are a "system in which uncertainty is the norm and the rules appear random and indiscriminate." *United States v. Mohammed, et al.*, AE144, at 3 (Jul. 13, 2009).

Congress ostensibly created this system to accommodate "the unique circumstances of the conduct of military and intelligence operations during hostilities[.]" 10 U.S.C. § 949a(b)(1). But that is precisely the problem here. Petitioner was not a belligerent in any hostilities. While the crimes he is alleged to have committed are undoubtedly serious, they did not occur on any battlefield. With respect to the bombing of the USS COLE, in particular, every agent of the U.S. government deemed that event to have occurred in peacetime, including the President, who told the country that "America is not at war." *The President's Radio Address*, 36 Wkly. Comp. Pres. Doc. 2464 (Oct. 14, 2000). The only thing that makes Petitioner's circumstances unique is the fact that he was tortured.

Before this Court, Petitioner initially challenged the military commissions' subject-matter jurisdiction on the ground that none of the offenses for which he is being tried were alleged to have been "committed in the context of and associated with hostilities." 10 U.S.C. § 950p(c). Respondents ultimately prevailed in persuading a divided panel of the D.C. Circuit that subject-matter jurisdiction should be subject to equitable abstention and only decided on post-trial appeal from any military commission judgment. *In re Al-Nashiri*, 835 F.3d 110, 118 (D.C. Cir. 2016). In reaching this holding, the Circuit accepted Respondents' contention that the only category of jurisdictional claims for which pre-trial habeas is available are challenges to personal jurisdiction. *Id.* at 133. The Circuit also left open the possibility that other claims, including significant procedural defects, may also be appropriate for pre-trial habeas. *Id.* at 130.

After more than fifteen years in custody without judicial review, nine of which have been spent entangled in military commission proceedings, Petitioner petitions this Court to grant him habeas relief on any one of three independent grounds:

*First*, the scope of the military commission's personal jurisdiction is unconstitutionally segregated. Under 10 U.S.C. § 948b, personal jurisdiction is delineated on the basis of citizenship status, a suspect classification that bears no rational, let alone compelling, relationship to Congress' stated desire to punish war criminals. Rather, Congress' segregation of the defendant class based on citizenship was motivated by animus toward non-citizens and the desire to avoid the political accountability lawmakers would face if constituents faced the prospect of trial under the military commissions' rump procedures. And the result has been predictable. Separate has not been equal. Indeed, it has not even been minimally just for Petitioner, the victims, or the public.

*Second*, personal jurisdiction depends upon Petitioner's status as an "unprivileged enemy belligerent," which is defined in terms of his having meaningfully engaged in recognized hostilities. 10 U.S.C. § 948a(7). Congress therefore defined personal jurisdiction before a military commission in terms that are significantly narrower than the scope of Respondents' detention authority over Guantanamo detainees generally. Here, Petitioner never engaged in any hostilities. And Respondents do not and cannot maintain that he has ever stepped foot on a recognized battlefield. Instead he was taken into custody in a global financial capital by a civilian agency on suspicion of his involvement in a crime that was investigated by the FBI and for which an indictment has been pending in the Southern District of New York since 2003. Respondents cannot, therefore, meet their burden of showing beyond a preponderance of the evidence that he is a "belligerent" subject to military commission jurisdiction.

*Finally*, if Petitioner is to be tried before a military commission, he cannot be denied his fundamental right to qualified counsel. By statute, 10 U.S.C. § 949a(b)(2)(C)(ii), and regulation, R.M.C. 506(b), Petitioner is given an express right to capitally qualified counsel. In October, the Chief Defense Counsel excused his only capitally qualified counsel and he is currently left with a junior Judge Advocate as the only attorney at counsel table. While other attorneys are assigned to his case, none of those attorneys are capitally qualified either. And despite this fact, the military commission judge is unlawfully proceeding through critical phases of the pre-trial process, including the testimony of witnesses and the admission of evidence, and has expressed his intent to proceed all the way through trial, regardless of whether Petitioner is properly represented. This clear violation of Petitioner's constitutional, statutory, and regulatory rights to representation must be remedied if this military commission proceeding is to be allowed to proceed.

After providing the relevant background, this petition is organized into five parts. The first lays out the relevant standard of review. The second lays out Petitioner's constitutional challenge to personal jurisdiction on equal protection grounds. The third lays out Petitioner's statutory and related constitutional challenge to personal jurisdiction on the ground that he is not a "belligerent." The fourth lays out Petitioner's challenge to his deprivation of counsel. And the fifth provides the relevant authority for why the claims asserted, particularly his counsel claim, are not subject to abstention.

## BACKGROUND

### A.     Petitioner's initial seizure and custody prior to 2006.

Petitioner was taken into custody in Dubai in late 2002 by the CIA. For the next four years, he was held incommunicado in secret "black sites" as part of the CIA's RDI Program. During this time, CIA agents subjected Petitioner to extreme forms of torture and abuse. In the

UNCLASSIFIED//FOR PUBLIC RELEASE

fifteen years that Petitioner has been detained, he has had no contact with the outside world except for his attorneys, periodic monitored telephone conversations with his family, and meetings with the International Committee of the Red Cross.

Most of the facts relating to Petitioner's time in the RDI Program are heavily classified. When Petitioner filed a petition for certiorari from the Circuit's previous decision in this case, Petitioner was able to provide a classified statement of facts to the Supreme Court based solely upon government records, obtained in the course of military commission discovery. Under a protective order issued by the military commission, however, Petitioner is presently forbidden from providing this Court with military commission documents that are classified. Petitioner's military commission counsel previously filed a motion seeking relief from this protective order in order to provide classified military commission documents to this Court via the Court Security Officer. That motion, however, was denied. AE013Q (Aug. 19, 2014).¹

Petitioner has included a redacted version of his statement of facts as Exhibit C. With this petition, Petitioner has also moved this Court for leave to file the unredacted copy of the statement of facts provided to the Supreme Court along with the supporting classified appendix through the Court Security Officer pursuant to the Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented Information and Procedures for Counsel Access to Detainees at the United States Naval Station in Guantanamo Bay, Cuba, in Habeas Cases Involving Top Secret/Sensitive Compartmented Information, Case Nos. 08-MC-442-TFH (Dkt. Nos. 1481 and 1496) & 08-cv-01207-RJR (Dkt. Nos. 79 & 80) (D.D.C. 9 January 2009).

---

¹ Pleadings in Petitioner's military commission case are indexed by Appellate Exhibit or "AE" number. Pleadings as well as transcripts of proceedings which are not classified or under seal may be accessed at: http://www.mc.mil/Cases.aspx?caseType=omc&status=1&id=34.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

What can be said is that Petitioner was subjected to "extreme physical, psychological and sexual torture" over the course of the four years during which he was in CIA custody. (Ex. B ¶12). This was despite the fact that, from early in his confinement, Respondent's agents put them on notice that Petitioner was "cooperative and truthful" and that the "consensus" was that he was "a compliant detainee" who was not "withholding important threat information." (Ex. A, at 3) SSCI Report at 67. In fact, a 2004 CIA assessment found that torturing Petitioner yielded "essentially no actionable information." (Ex. A, at 9).

Aggravating these circumstances are Petitioner's well-documented intellectual limitations. While his numerical IQ is presently unknown, Petitioner failed to graduate high school until the age of twenty-five. (Ex. C, at 10). And, from early in his confinement, Respondents received reports that Petitioner's intellectual disabilities made him particularly vulnerable to abuse. In addition to other classified reports, the CIA's Deputy Director of Operations responsible for the RDI Program publicly stated that Petitioner's observed intellectual limits belied earlier preconceptions that he was the "mastermind" of the USS COLE bombing: "'Mastermind' was not an apt description of [Petitioner]. One of our interrogators described him to me as 'the dumbest terrorist I have ever met.'" (Ex. C, at 11).

This torture has had profound and lasting effects on Petitioner's mental health. In late 2012, military commission prosecutors requested a competency board of military doctors to evaluate Petitioner. It found that Petitioner continued to present with nightmares that invoked being chained, naked, and waterboarded, and that he continues to suffer from Post-Traumatic Stress Disorder and Major Depressive Disorder. (Ex. C, at 11). This diagnosis was corroborated by Dr. Sondra Crosby, who found that Petitioner "suffers from [untreated] post-traumatic stress disorder[,]" with its concomitant hypervigilance, flashbacks, sleep disorders, and nightmares.

UNCLASSIFIED//FOR PUBLIC RELEASE

(Ex. B, ¶13). He also has "[m]ultiple other physical complaints, headaches, chest pain, joint pain, stomach pain." (Ex. C, at 11). In particular, he has "persistent and chronic anal-rectal complaints, difficulty defecating, bleeding, hemorrhoids, [and] pain with sitting" – symptoms "very common in survivors of sexual assault." *Ibid*. While long-lasting effects from torture would be expected, she found that factors unique to Guantanamo and the military commission exacerbate Petitioner's symptoms. (Ex. B, ¶16). Because Guantanamo was itself a "black site," Petitioner is routinely presented with psychological triggers that cause him "intense anxiety, dissociation, and painful flashbacks." (Ex. B, ¶17).

**B.      Petitioner's post-2006 detention in Guantanamo and subsequent military commission proceedings.**

Respondents have never alleged petitioner's involvement in the September 11th attacks, the war in Afghanistan, or any other hostilities. In September 2006, however, Respondents brought Petitioner to Guantanamo to be held as a so-called "enemy combatant." A Combatant Status Review Tribunal determined that Petitioner was an "enemy combatant" in April 2007. And in 2008, Respondents ordered Petitioner to stand trial before a military commission for his alleged involvement in plots to bomb the USS COLE in Yemen in October 2000 and a French oil tanker in Yemen in 2002. These initial charges carried the death penalty and largely mirrored a capital indictment that has been pending in the Southern District of New York since 2003 in which Petitioner is named as an unindicted co-conspirator. *United States v. al-Badawi, et al*., No. 98-CR-1023 (S.D.N.Y., unsealed May 15, 2003).

The 2008 military commission charges were withdrawn in 2009 following President Barack Obama's taking office and the initiation of an agency review of the military commissions. In 2011, charges were again brought against Petitioner under the Military

Commissions Act of 2009, 123 Stat. 2190 §§ 1801-1807 (codified at 10 U.S.C. §§ 948a, *et seq*.), and his case has remained in pre-trial proceedings ever since.

Over the past nine years, these proceedings have been plagued by irregularity, political interference, and delay. The vast majority of these issues are related, in some form or another, to Respondents' decision to subject Petitioner to the RDI Program. The rules themselves reflect this. Under Military Commission Rule of Evidence 304(a)(1), evidence "obtained by" torture is excluded. But that prohibition is narrowed by Rule 304(a)(5), which repeals the derivative evidence rule. As a result, only evidence taken "under" torture is excluded, whereas any evidence derived from torture is admissible so long as the military commission judge generically finds that the "use of such evidence would otherwise be consistent with the interests of justice." Under Rule 304(a)(3), the prohibition on evidence derived from torture is narrowed even further by the fact that coerced evidence taken from third-parties is generally admissible. And these limits, in turn, are even further undermined by the permissive admissibility of hearsay, Rule 803, and even "hearsay within hearsay." Rule 805.

Likewise, despite the passage of nine years since charges were first brought against Petitioner, prosecutors in the military commissions continue to be unable to get the bureaucratic approval necessary to provide discovery relating to the RDI Program to Petitioner's defense counsel. Trans. 6499-11 (Sept. 9, 2016). Indeed, it is not even clear that the CIA intends to produce exculpatory documents in its possession. *See* Carol Rosenberg, *Will CIA comply with Guantánamo judge's order? Agency won't say*, Miami Herald (Apr. 22, 2014). And on September 1, 2017, the prosecution admitted that it is unlikely to meet its initial discovery obligations until at least the middle of 2018. Gov't Resp., AE203S (Sept. 1, 2017).

Relatedly, Petitioner is routinely denied a meaningful opportunity to assist in his defense on the ground that discovery materials related to his treatment in the RDI Program remain classified. Prosecutors have stated on the record that approximately 14% of the documentary evidence that it has produced, evidence it concedes is relevant to Petitioner's capital prosecution, cannot be shared or discussed with him, even when it relates to Petitioner's own treatment in U.S. custody. Trans. at 3121. On numerous other occasions, the military commission judge has involuntarily excluded Petitioner from the proceedings because his treatment in the RDI Program was being discussed. This exclusion causes Petitioner intense anxiety, which is exacerbated by the fact that his attorneys are forbidden from even discussing these hearings with him. (Ex. B, ¶25). In fact, the pervasive secrecy does not only limit Petitioner's ability to participate in his defense. It affects his counsel too. Despite the fact that all of his counsel must have Top Secret/SCI security clearances, military commission prosecutors have filed approximately one hundred *ex parte* pleadings with the military commission.

The lasting psychological effects of the RDI Program regularly impact the proceedings as well. As Dr. Crosby found, the military commissions' "ever-changing rules and procedures" exceed Petitioner's capacity to comprehend and he "has no way of differentiating this from the government's prior deliberate attempts to destabilize his personality." (Ex. B, ¶21). This was vividly demonstrated on one occasion when a floor safe was brought, for reasons unknown, into the courtroom in Guantanamo. One of the "techniques" to which Respondents subjected Petitioner in the RDI Program was to lock him in a "small box," which was the approximate size of this safe. Once locked inside this "small box," Petitioner was left in total darkness as the air became stagnant and he braced himself in a squatting fetal position, which caused his extremities to swell. (Ex. C, at 6). Seeing what appeared to be the "small box" brought into the courtroom

produced such a strong reaction in Petitioner that he was unable to proceed until his attorneys

persuaded the military commission judge to remove it. (Ex. C, at 15).

Then there are the quixotic logistics of Guantanamo, including multiple, competing

chains-of-command over the base and its operations that prevent the military judges from

exercising meaningful control over the proceedings. In July, for example, a change to

transportation logistics forced the military commission judges to travel in close quarters with the

trial participants, news media, and victim family members. This led to a bureaucratic standoff

that was only resolved after they abated proceedings in protest. Order, AE379B (Jul. 17, 2017).

This followed an earlier initiative to coerce the military commission judges into moving the

cases faster by sequestering them in Guantanamo. Order, AE332U (Mar. 4, 2014). Even the

military commission judge's orders for routine testing, such as an order for an MRI to determine

whether petitioner's intellectual disabilities are the result of organic brain damage, continue to be

ignored for years. Order, AE277H (Sept. 29, 2014).

The proceedings themselves suffer from routine interference. Respondents' interference

with the proceedings was potentially on display as recently as last Friday, when the "hockey

light" went off inexplicably as counsel for the prosecution began discussing the most recent

attorney-client confidentiality issue (described below). Carol Rosenberg, *Pentagon says glitch

triggered Guantánamo war court kill switch*, Miami Herald (Nov. 7, 2017) *archived at*

https://perma.cc/6LEJ-Z9TU. The "hockey light" is a silent alarm that flashes when the Court

Security Officer censors the proceedings. Its activation triggers an abrupt halt to a proceeding

and a termination of the audio feed to courtroom observers. Yet, neither the Court Security

Officer nor the presiding military commission judge, Col Vance Spath, USAF, had activated the

hockey light. On the record, Col Spath accepted a Pentagon official's representations that its activation was the result of a technical glitch. *Ibid*.

But that explanation is by no means beyond dispute. In January 2013, after a similarly unexpected activation of the hockey light in another military commission proceeding, it was discovered that the CIA had a separate video feed of the proceedings as well as the capacity to unilaterally trigger the hockey light, which they had apparently done. 60 Minutes, *Inside Guantanamo* (Nov. 3, 2013) *available at* https://www.cbsnews.com/news/inside-guantanamo/. On the heels of this discovery, Petitioner discovered that the military commissions' special courtroom, the "Expeditionary Legal Complex", was wired to record even the faintest whispers at counsel table. AE149 (Feb. 1, 2013). When Petitioner raised these concerns during commission proceedings and attempted to create a factual record to justify relief, the presiding military commission judge retorted, "Does it surprise you that the United States government has all sorts of ability to monitor conversations throughout the world?" Trans. at 1556.

Respondents have also regularly interfered with Petitioner's counsel rights. Petitioner has had no fewer than fifteen different attorneys over the past decade. Throughout that time, the only consistent lawyer was Mr. Richard Kammen, an experienced capital defense lawyer, who served as learned counsel for Petitioner in the military commission proceedings since 2008.

Most of this turnover in Petitioner's counsel has been a consequence of the military's rotation schedule, such that Judge Advocates may generally serve in the Military Commissions Defense Organization for only three years before being rotated to a new duty station. This has prevented Petitioner from forming lasting relationships with counsel, which in turn continues to have a "significantly deleterious effect" on Petitioner's ability to trust his attorneys and participate in his defense. (Ex. B ¶24). While most of these attorneys withdrew from Petitioner's

case with his consent, in the fall of 2014, Petitioner's attorney-client relationship with his longstanding military defense counsel, CDR Brian Mizer, USN, was severed over his vehement objection. This loss of CDR Mizer, Dr. Crosby found, was "particularly damaging" because Petitioner "had a particularly trusting relationship" with him. (*Ibid*.).

But Respondents have also severed other attorney-client relationships for reasons unrelated to the management of the military bureaucracy. One such attorney was Ms. Nancy Hollander, a civilian attorney with a longstanding Top Secret/SCI clearance and a renowned expert on national security litigation, who had represented and regularly met with Petitioner since 2008. For reasons that have never been fully explained, Respondents terminated her access to the Special Access Program (SAP) that is necessary to meet with Petitioner. Notably, Respondents did not terminate her security clearance or accuse her of a security violation. They simply terminated her SAP authorization, which had the discrete effect of barring her from further meetings with Petitioner or from entering the courtroom to represent him. When Petitioner's military commission counsel sought remedies, including an answer as to why her SAP access had been terminated, the presiding military commission judge simply ruled that "The Commission cannot declassify information, grant security clearances or access to special programs." AE178E (Feb. 7, 2014).

Last month, Petitioner lost all his longstanding defense counsel, including Mr. Kammen, after Respondents' actions created an ethical dilemma that forced them to withdraw. While the precise reasons Petitioner's civilian counsel applied to withdraw remain classified,[2] they reflect a

---

[2] As noted above, under a protective order issued by the military commission, Petitioner's counsel is presently forbidden from providing this Court with military commission documents that are classified.

confluence of the factors that have made Petitioner's military commission proceedings

dysfunctional over the past decade.

What can be said in this unclassified pleading is that on June 14, 2017, the Chief Defense

Counsel, Brigadier General John Baker, USMC, issued a memorandum, which advised defense

counsel that he had recently received information indicating that the meeting spaces in which

military commission defendants met with their lawyers could not guarantee confidentiality.[3] He

cautioned counsel to "not conduct any attorney-client meetings at Guantanamo Bay, Cuba until

they know with certainty that improper monitoring of such meetings is not occurring." He then

continued:

> At present, I am not confident that the prohibition on improper monitoring of
> attorney-client meetings a GTMO as ordered by the commission is being
> followed. My loss of confidence extends to all potential attorney-client meeting
> locations at GTMO. Consequently, I have found it necessary as part of my
> supervisory responsibilities under 9-1a.2 and 9-1a.9 of the Regulations for Trial
> by Military Commission to make the above-described recommendations to all
> MCDO defense counsel. Whether, and to what extent, defense teams follow this
> advice is up to the individual defense team.

Brig. Gen. John Baker, USMC, *Improper Monitoring of Attorney-Client Meetings* (June 17,

2017) *archived at* https://perma.cc/ZG78-PPFE.[4]

---

[3] The Chief Defense Counsel is an office created by Congress, 10 U.S.C. § 948k(d), to administer
the provision of legal defense services to defendants before military commissions. The Chief
Defense Counsel is a general officer nominated by the President and confirmed by the Senate,
161 Cong. Rec. S4555 (daily ed., Jun. 23, 2015) (confirmation as Chief Defense Counsel and
Brigadier General), after being selected by a joint selection board. Under the applicable
regulations, the Chief Defense Counsel serves in a role similar to that of a federal district judge
under the Criminal Justice Act, respecting the supervision of defense counsel who appear before
military commissions. *See* Reg. T. Mil. Comm. 9-1, *et seq.* He is the sole actor within the
military commission system empowered to assign defense counsel (a process called "detailing"),
to supervise defense counsel, and to excuse defense counsel. R.M.C. 505(d)(2).

[4] This June 2017 discovery followed a longstanding pattern of similar intrusions into attorney-
client confidentiality. In October 2011, for example, the JTF-GTMO guard staff confiscated
privileged legal materials from the detainees' cells. The Legal Department at the Naval Base
read defense counsel's correspondence and in January 2012, the Chief Defense Counsel issued

After receiving this memorandum, Petitioner's military commission defense counsel filed

a motion with Col Spath seeking permission to notify Petitioner of the nature of BGen Baker's

concerns. Col Spath denied Petitioner's motion on the ground that he was not authorized to

approve the disclosure of classified information to individuals without a security clearance and

because of the prosecution's representations that the issue did not affect Petitioner's meeting

spaces. Petitioner's counsel subsequently discovered evidence that unambiguously contradicted

the prosecution's previous assurances. The factual basis for this representation is classified. But

Petitioner's undersigned counsel can proffer to this Court that the evidence is compelling and

---

an ethics instruction prohibiting defense counsel from using the Guantanamo legal mail system
for privileged communications as incapable of safeguarding attorney client-privileged
communications. As a consequence, defense counsel were unable to exchange confidential
written communications with their client for almost two years until a consent order regarding
privileged written communications management was entered.

The confidentiality of in-person attorney-client meetings has also been routinely
compromised. In January 2012, JTF-GTMO's chief staff attorney reportedly discovered the
rooms in which defense counsel had been meeting with their clients were wired with
microphones hidden inside smoke detectors. The prison camp commander was apparently
unaware of this discovery and defense counsel did not become aware of it until December 2012,
when an attorney traced the brand name of one of the smoke detectors to a surveillance
company. The following month, it was discovered that the Expeditionary Legal Center ("ELC")
courtroom was wired to record sounds as quiet as a whisper anywhere in the room, even when
counsel's table microphones were purposely muted. And reflecting the fact that this monitoring
was actually ongoing, an unidentified third-party, outside of the ELC, cut the public audio feed
of the proceedings during one proceeding without the knowledge or approval of the presiding
military commission judge.

Even attorney-client work product has not been immune from improper intrusion. In
March 2013, defense counsel discovered, through a series of IT-related failures, that some
unknown amount of privileged work product had been provided to counsel for the prosecution,
IT personnel not bound by non-disclosure agreements, and other unknown entities in the
government. It was also discovered, despite assurances to the contrary, that active content
monitoring of defense counsel's internet usage was being undertaken on a government-wide
basis. As a consequence of this and other similar episodes, the Chief Defense Counsel issued an
ethics instruction prohibiting defense counsel from using Department of Defense computer
networks, including email, to transmit privileged or confidential information. Efforts to mitigate
the risk of improper disclosure more than tripled the amount of time necessary to draft and file
pleadings. And the previous military commission judge presiding over Petitioner's case was
forced to abate the proceedings for two months as a result.

would provide no reasonable attorney with confidence that they could maintain attorney-client confidentiality in such spaces.

Upon discovering this evidence, Petitioner's counsel again sought intervention from Col Spath. Specifically, Petitioner sought discovery to investigate the extent of the intrusions into his attorney-client meeting spaces and the opportunity to seek orders preventing further intrusions. Petitioner's counsel also sought, in the interim, permission to conduct attorney-client meetings in a designated area of the Expeditionary Legal Complex in Guantanamo, where confidentiality could be more reasonably assured.

On September 20, 2017, Col Spath denied Petitioner's requests for discovery and other relief. These rulings are classified. Undersigned counsel has reviewed them, however, and can relate to this Court that Col Spath concluded, as a matter of law, that Petitioner's entitlement to attorney-client confidentiality extends only to the prohibition on counsel for the prosecution using his attorney-client communications as evidence. In other words, Col Spath determined that Petitioner had no expectation of confidentiality when conferring with counsel, except insofar as his communications might be used against him in the military commission proceedings. And because of Col Spath's previous ruling, Petitioner's counsel could not even inform Petitioner of the broader risks to confidentiality.

Mr. Kammen brought Col Spath's orders to BGen Baker, who has the necessary security clearances to review both the orders themselves as well as the underlying classified facts. Mr. Kammen noted his concerns that proceeding in a capital case, where attorney-client confidentiality was so circumscribed, might be unethical under the Indiana Rules of Professional Responsibility. Similar ethical concerns were raised by Petitioner's other trial defense counsel.

Pursuant to the governing procedures applicable to the Indiana Bar, Mr. Kammen sought

an ethics opinion from Professor Ellen Yaroshefsky. Professor Yaroshefsky is the Howard

Lichtenstein Distinguished Professor of Legal Ethics and Executive Director of the Monroe

Freedman Institute for the Study of Legal Ethics at Hofstra University School of Law. Mr.

Kammen provided Prof. Yaroshefsky unclassified facts of the kind provided here. Prof.

Yaroshfsky's legal analysis evaluated the Indiana Rules of Conduct, the Model Rules of

Professional Conduct, and national ethics opinions and case law. Prof. Yaroshefsky concluded

that Mr. Kammen's continued representation of Petitioner would be unethical:

> You cannot, consistent with your ethical obligation continue to represent Mr.
> Nashiri. Rule 1.16(a)(1) of Professional Conduct mandates that you withdraw
> from representation. It provides that a lawyer "shall withdraw from
> representation of a client if the representation involves a violation of the rules of
> professional conduct or other law." You are required to withdraw as his counsel
> because continued representation will result in a violation of IRPCs and MRPCs
> 1.1, 1.3. 1.4 and 1.6.

(Dkt. 278-2, at 29).

On October 6, 2017, Mr. Kammen and two other civilian defense counsel submitted

applications to BGen Baker to withdraw on the grounds that their continued involvement in this

case violated the ethical rules to which they are subject. (Dkt. 278-2, at 20). Under the unique

rules the Secretary of Defense has promulgated to govern military commissions, the Chief

Defense Counsel is given the sole authority to excuse defense counsel after an attorney-client

relationship has been formed. R.M.C. 505(d)(2) (2010). Pursuant to that authority, BGen Baker

granted these applications, specifically referencing the classified information to which he was

privy. (Dkt. 278-2, at 19). BGen Baker then filed a notice with the Convening Authority (the

Department of Defense office responsible, *inter alia*, for the administration of the military

commissions) that he had "begun the process of locating a qualified outside learned counsel to

serve as [Petitioner]'s learned counsel and I will submit a request for funding approval as soon as I have identified such counsel." (Dkt. 278-2, at 18).

This left Petitioner represented by LT Alaric Piette, USN, a Navy Judge Advocate, who graduated from law school in 2012, has limited litigation experience, and has never tried a homicide case. (Dkt. 278-2, at 101-102).[3] LT Piette joined the defense team in July 2017 and has now appeared at two hearings on Petitioner's behalf. (*Ibid*.). In addition to LT Piette, there are also three other military attorneys detailed to Petitioner's case, but none have met him yet or are currently able to make an appearance in the military commission.

On October 13, 2017, LT Piette filed notices with the military commission of the civilian counsels' excusal. LT Piette also moved to abate the proceedings until BGen Baker had located new learned counsel. (Dkt. 278-2, at 2). On October 16, 2017, Col Spath issued a "Briefing Order," which, without elaboration, asserted that he had not found "good cause" to excuse civilian defense counsel, including Mr. Kammen. On October 27, 2017, Col Spath issued an order denying LT Piette's motion to abate. While not purporting to vacate BGen Baker's order of excusal, Col Spath asserted that he had the authority to countermand BGen Baker's findings of good cause. (Dkt. 278-2, at 57).

On the morning of October 29, 2017, Col Spath issued an order for briefing on how the hearings should proceed in the absence of learned counsel to represent the accused. LT Piette filed a notice with the military commission that because he was not qualified to be learned counsel, he could not take a position on any matter other than the need to have learned counsel detailed to the case. Counsel for the prosecution demanded that the hearings proceed in the

---

[3] LT Piette has not yet sought to withdraw. LT Piette is currently evaluating his own ethical obligations vis-à-vis the issue of attorney-client confidentiality, which due to the Navy's supervision, requires administrative review that is not yet complete.

absence of learned counsel. The prosecution further asked Col Spath to hold the excused counsel in contempt for failing to appear.

On the morning of October 31, 2017, Col Spath convened a hearing of the military commission. After noting that the excused counsel were not present and that he disagreed with BGen Baker's finding of good cause to excuse them, Col Spath announced that he intended to proceed with the scheduled hearing, irrespective of whether Petitioner was represented by learned counsel:

> MJ [Col Spath]: … I would get familiar with *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], and I would get familiar with learned counsel being available to the extent practicable, because we are moving forward this week. We are going to have a witness testify on Thursday or Friday that came down on the flight, and next week we are going to be moving through the al Darbi deposition issues and through the al Darbi cross-examination, and then we are going to move into the other things that are on the docket. And I would suggest if anyone disagreed with my ruling on an abatement that they file a writ. We all know the process here, and I don't have to explain it.

Trans. 10028 (Dkt. 278-2, at 77). Col Spath ordered BGen Baker to testify about his decision to excuse Mr. Kammen, which BGen Baker objected to on grounds of privilege. Col Spath then attempted to order BGen Baker "to rescind the direction you gave when you excused both learned outside – appointed learned counsel and the two civilians." Trans. 10042 (Dkt. 278-2, at 91). BGen Baker refused this order as *ultra vires* and Col Spath announced that he was going to convene a contempt proceeding against BGen Baker on Wednesday, November 1, 2017.[6]

---

[6] Col Spath does not appear to have the authority to hold individuals in contempt for violating his orders. Under the applicable statute, 10 U.S.C. § 950t(31), contempt before a military commission is limited to "any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any riot or disorder." 10 USC § 950t(31). Under the previously identical provision of the U.C.M.J, 10 U.S.C. § 848 (2006), contempt did not apply to the "Violation of [a military judge's] orders." Manual for Courts-Martial, R.C.M. 809, *discussion* (2008); *see also United States v. Scaff*, 29 M.J. 60, 66 (C.M.A. 1989).

Col Spath then announced his intention to continue to move forward, potentially through

trial, even if Petitioner remains unrepresented by learned counsel. Trans. 10048 (Dkt. 278-2, at

97). LT Piette protested this decision, but was rebuffed:

> DDC [LT PIETTE] … [A]s the only counsel in this room who has been detailed
> specifically to defend Mr. al Nashiri, I aim to defend him. And I cannot do that
> without a learned counsel because, by statute, he has to have one.
>
> MJ [Col SPATH]: We have already dealt with that.
>
> DDC [LT PIETTE]: Yes, Your Honor.
>
> MJ [Col SPATH]: The issue is resolved. You are welcome to file a writ. You've
> got your chief appellate counsel here, apparently, to make an appearance on the
> record to a case that he's not detailed to. I would file a writ, and maybe the
> C.M.C.R. will step in quickly, or maybe they won't. Maybe three weeks from
> now they will step in and say, Spath, you got it wrong again, like I have twice
> already. Sorry. And we will come back and do it again. But again, your order is
> easy. We will be here Thursday -- we will be here at noon tomorrow and we will
> be here Thursday with the government's witness, who flew down here on an
> airplane. You can engage in the direct or you can waive it affirmatively on the
> record. But again, I would read those cases after *Strickland*, understand where
> we are at, and understand that I find learned counsel are not practicable in the
> near term, if ever, by the actions of General Baker.

Trans. 10048-49 (Dkt. 278-2 at 97-98). Following this hearing, Petitioner's counsel immediately

drafted a motion for a preliminary injunction as well as a motion for a temporary restraining

order seeking an order preventing Col Spath from proceeding to trial while Petitioner remains

unrepresented by qualified counsel. While that motion was pending, Col Spath ordered BGen

Baker to be imprisoned and fined for contempt, which is the subject of the case of *Baker v.

Spath*, Case No. 17-cv-02311 (RCL), also pending before this Court.

Following this Court's denial of the temporary restraining order, Col Spath continued

with pre-trial hearings, which involved the testimony of numerous witnesses and the "pre-

admission" of substantial physical evidence. As these proceedings were underway, Col Spath

repeatedly berated LT Piette for refusing to proceed in the absence of learned counsel. The following exchange is representative:

> MJ [Col SPATH]: ... Defense Counsel, do you have any questions for this witness?
>
> DDC [LT PIETTE]: Your Honor, the defense takes no position.
>
> MJ [Col SPATH]: All right. I think both of us are probably going to sound like the same record, that at least in the court's opinion it is taking a position on evidentiary matters that, again, are fairly standard, if not completely standard, in any court or tribunal for real evidence.

Trans. 10326-27. In support of his position, LT Piette submitted an affidavit from Ms. Emily Olsen-Gault, Director & Chief Counsel ABA Death Penalty Representation Project, which explained the need for learned counsel at all critical stages of a death penalty case. (Ex. D). On November 6, 2017, Col Spath *sua sponte* ordered Prof. Yaroshefsky and Ms. Olsen-Gault to testify from a video-teleconference site in Virginia. On November 13, 2017, Ms. Olsen-Gault testified about the ABA's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*. Ms. Olsen-Gault reiterated her view that LT Piette was not competent to represent Petitioner without the assistance of learned counsel under the ABA Guidelines.[7] Nevertheless, Col Spath has announced his intention to continue to press forward on substantive issues. In fact, just yesterday, he issued two orders relieving the prosecution of any further discovery obligations, including with respect to evidence surrounding the RDI Program. AE045OOO (Nov. 13, 2017); AE120YYYYYY (Nov. 13, 2017).

Once the pre-trial hearings scheduled for the remainder of this week conclude, the next round of pre-trial hearings in Petitioner's case is currently scheduled to begin on January 16,

---

[7] Prof. Yaroshefsky moved to quash the order to testify on various grounds. That action remains pending in the Southern District of New York. *Yaroshefsky v. Mattis*, Case No. 17-cv-08718 (GHW) (S.D.N.Y., filed Nov. 9, 2017).

2018. From the bench yesterday, however, Col Spath indicated that he may schedule additional

hearings on December 11, 2017. Trans. 10587. Prior to his recent loss of counsel, Petitioner's

actual trial on the merits was expected – though not yet scheduled – to commence in 2020.

### C.    Prior relevant federal court proceedings.

Petitioner filed an appeal of the CSRT's finding of his enemy combatant status in the

D.C. Circuit pursuant to the Detainee Treatment Act (DTA) in 2007. The following year the

Circuit dismissed his DTA appeal pursuant to *Bismullah v. Gates*, 551 F.3d 1068 (D.C. Cir.

2009), finding that the Supreme Court's decision in *Boumediene v. Bush,* 553 U.S. 723 (2008)

invalidated the DTA appellate process by implication. *Al-Nashiri v. Gates*, Case No. 08-1007,

slip op. (D.C. Cir., Apr. 24, 2009) (per curiam).

In November 2011, Petitioner filed a declaratory judgment action against Respondents,

challenging the subject-matter jurisdiction of the military commission. Respondents succeeded in

having the case dismissed under 28 U.S.C. § 2241(e)(2) on the ground that the relief he sought

had to be raised via habeas corpus. *Al-Nashiri v. MacDonald*, 741 F.3d 1002, 1009 (9th Cir.

2013). Petitioner duly challenged the military commission's subject-matter jurisdiction in this

Court by filing a supplemental petition for habeas corpus and requesting a preliminary

injunction. On December 29, 2014, this Court granted leave to file a supplemental petition, but

denied Petitioner's motion for a preliminary injunction on the ground that the district courts

should abstain from hearing such claims pre-trial. *Al-Nashiri v. Obama*, 76 F.Supp.3d 218

(D.D.C. 2014).

Petitioner filed a timely notice of appeal and, contemporaneously, petitioned for a writ of

mandamus challenging the military commissions' subject-matter jurisdiction. Those two actions

were consolidated and on August 30, 2016, a divided panel of the D.C. Circuit affirmed the

district court's decision to abstain and denied petitioner's petition for a writ of mandamus. Judge Tatel dissented. The majority affirmed the extension of "the principles announced in *Councilman* to Al-Nashiri's case." *Al-Nashiri*, 835 F.3d at 118. Nevertheless, the Circuit identified several categories of claims for which abstention was inappropriate, including any claim that the "military tribunal [lacks] personal jurisdiction over the defendant." *Id*. at 130, 133. The Supreme Court denied certiorari on October 16, 2017.

On November 1, 2017, Petitioner filed a motion for a preliminary injunction and a motion for a temporary restraining order seeking to enjoin further military commission proceedings on the ground that he was being denied his right to capitally qualified counsel. The temporary restraining order sought a halt to pre-trial proceedings that were due to commence on the morning of November 3, 2017. On November 2, 2017, this Court held a hearing and orally denied the motion for a temporary restraining order without prejudice to Petitioner's motion for a preliminary injunction, citing the abstention rule articulated by the D.C. Circuit. On agreement of the parties, Petitioner withdrew his motion for a preliminary injunction and filed this petition for a writ of habeas corpus pursuant to the schedule, filed with this Court on November 8, 2017.

## REASONS FOR GRANTING THE WRIT

### I.   STANDARD OF REVIEW

"The foundation of the Supreme Court's habeas jurisprudence is that the Great Writ lies

at the core of this nation's constitutional system and that it is the duty of the courts to remedy

lawless executive detention." *In re Guantanamo Bay Detainee Litig.*, 953 F. Supp. 2d 40, 48-49

(D.D.C. 2013), *rev'd sub nom. Hatim v. Obama*, 760 F.3d 54 (D.C. Cir. 2014). That detention

may be lawless because it is wholly arbitrary, because the conditions of detention are unlawful,

or because Petitioner's detention entails his trial and execution before a tribunal that lacks lawful

authority. *See, e.g., In re Yamashita*, 327 U.S. 1, 9 (1946) ("[T]he Executive branch of the

government could not, unless there was suspension of the writ, withdraw from the courts the

duty and power to make such inquiry into the authority of the commission as may be made by

*habeas corpus*."); *Johnson v. Eisentrager*, 339 U.S. 763, 775 (1950) (even during declared wars,

a military commission defendant can challenge "the existence of a state of war and whether he is

an alien enemy.").

Respondents bear the burden of persuasion in demonstrating that their treatment of

Petitioner, while he remains detained, is lawful. *Mohammed v. Obama*, 689 F. Supp. 2d 38, 41

(D.D.C. 2009) (citing *Boumediene v. Bush*, 553 U.S. 723, 786 (2008); *Hamdi v. Rumsfeld*, 542

U.S. 507, 533–34, (2004)). Questions of law are decided by this Court *de novo*. *Odah v. United

States*, 611 F.3d 8, 13 (D.C. Cir. 2010). For questions of fact and mixed questions of law and

fact, Respondents must meet a preponderance of the evidence standard, under which this Court

must conclude that "that the existence of a fact is more probable than its nonexistence."

*Sulyaman v. Obama*, 729 F. Supp. 2d 26, 34 (D.D.C. 2010) (citing *Concrete Pipe & Prods. of

Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)); *see also

Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010).

Petitioner's first and third grounds for relief, which assert the unconstitutionality of the Military Commissions Act's delineation of personal jurisdiction and the unlawful denial of capitally qualified counsel respectively, present pure questions of law that this Court reviews *de novo*. Petitioner's second ground for relief, which asserts that Respondents' military commission has no personal jurisdiction over him because he is not an "unprivileged enemy belligerent," presents a mixed question of law and fact for which Respondents bear the burden of persuasion by a preponderance of the evidence. *See Al-Warafi v. Obama*, No. 09-cv-2368 (RCL), 2015 WL 4600420, at *7 (D.D.C. July 30, 2015).

## II. SEGREGATING CATEGORIES OF DEFENDANTS BY MAKING PERSONAL JURISDICTION DEPENDENT UPON CITIZENSHIP STATUS VIOLATES DUE PROCESS.

The exercise of personal jurisdiction in a criminal case violates due process when the "application of the statute to the defendant [is] arbitrary or fundamentally unfair." *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) (*quoting United States v. Juda*, 46 F.3d 961, 967 (9th Cir. 1995)). That can result from the arbitrary application of a facially neutral statute, *ibid*., or, as here, where a law's "narrow statutory coverage" targets a suspect class. *See McLaughlin v. State of Fla.*, 379 U.S. 184, 194 (1964).

Under §948c of the Military Commissions Act, personal jurisdiction reaches only "*alien unlawful enemy belligerents.*" 10 U.S.C. § 948c (emphasis added). Personal jurisdiction, therefore, invidiously targets a suspect class for prosecution. Citizens who commit terrorism offenses must face a regular judicial trial. Non-citizens, such as Petitioner, can be segregated into a non-judicial trial process, whose irregularity is, as shown above, incontrovertible. That irregularity is the inevitable result of the kind of discrimination presented here: Separate is not equal and, in matters of criminal justice, the irreducible due process minimum is equal justice

under law. Because §948c violates that basic principle, Petitioner asks this Court to enjoin

further proceedings against him. *See Reid v. Covert*, 354 U.S. 1 (1957) (enjoining court-martial

proceedings where the statutory basis of personal jurisdiction was unconstitutional).

### A. This Court must apply strict scrutiny to the *de jure* segregation of the justice system.

Based on the most pertinent Supreme Court precedents, there are at least two reasons that

this Court must apply strict scrutiny to §948c, when deciding whether Congress' delineation of

personal jurisdiction violates the equal protection component of the Due Process clause.

*First*, outside the context of political rights or immigration policy, citizenship status is a

suspect classification. The Supreme Court has repeatedly described non-citizens as "a prime

example of a 'discrete and insular' minority for whom heightened judicial solicitude is

appropriate." *Graham v. Richardson*, 403 U.S. 365, 371 (1971). "[C]lassifications based on

alienage, like those based on nationality or race, are inherently suspect and subject to close

judicial scrutiny." *Id.* at 372. To be sure, the Supreme Court initially made this holding in the

context of State laws. But in subsequent cases, the Court has made clear that "the Fifth

Amendment protects aliens whose presence in this country is unlawful from invidious

discrimination by the Federal Government." *Plyler v. Doe*, 457 U.S. 202, 210 (1982) (*citing

Mathews v. Diaz*, 426 U.S. 67, 77 (1976)).

*Second*, even if citizenship status were not a suspect classification, the *de jure*

discrimination at issue here impairs Petitioner's fundamental rights in a criminal proceeding.

Even for groups of people that may otherwise be discriminated against by the federal

government, "our own constitutional guaranties of due process and equal protection both call for

procedures in criminal trials which allow no invidious discriminations between persons and

different groups of persons[.]" *Griffin v. Illinois*, 351 U.S. 12, 17 (1956). Anything less thwarts

"the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court." *Ibid*. (quotations omitted).

To be sure, in *United States v. Hamdan*, 801 F.Supp.2d 1247 (USCMCR 2011), the USCMCR applied "deferential rational basis" scrutiny to uphold §948c against an equal protection challenge. *Id*. at 1321. An equal protection claim was also raised on appeal in the D.C. Circuit case of *Bahlul v. United States*, though the Circuit ultimately divided on the result. The deciding votes in *Bahlul* held that because the appellant had forfeited the objection at trial, his "Equal Protection claims [were] foreclosed" under the plain error rule. *Bahlul v. United States*, 840 F.3d 757, 775 (D.C. Cir. 2016) (Millet, J.). In a separate opinion, joined by three other members of the Court, Judge Kavanaugh concluded that, even had it not been forfeited, §948c survived rational basis review because the federal government enjoyed more latitude when legislating the rights of noncitizens. *Bahlul v. United States*, 767 F.3d 1, 75 (D.C. Cir. 2014) (Kavanaugh, J.).

While this Court should review Judge Kavanaugh's opinion and the USCMCR's opinion for their persuasive force, neither are binding. *See, e.g.*, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 14 (D.D.C. 2013). And given the relative brevity of both, neither should be given significant weight. Neither considered, let alone distinguished, cases like *Plyler*, which have held "the United States, to which the Constitution assigns a broad authority over both naturalization and foreign affairs, is barred from invidious discrimination with respect to unlawful aliens[.]" 457 U.S. at 210 n.9. And neither addressed the separate need for strict scrutiny that arises from the fact that making personal jurisdiction contingent upon citizenship status denies equal justice under law in criminal proceedings.

## B.    Section 948c fails strict scrutiny.

To satisfy strict scrutiny, §948c must be narrowly tailored to serve a compelling governmental interest. *Graham*, 403 U.S. at 376. As an initial matter, no rational – let alone compelling – national security interest is served by segregating non-citizens into military commissions. Citizens are just as capable of joining al Qaeda, just as capable of perpetrating acts of terrorism, and "if released, would pose the same threat of returning to the front during the ongoing conflict." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (plurality op.); *see also United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) (affirming the convictions of two citizens, José Padilla and Kifah Jayyousi, along with a non-citizen, Adham Hassoun, of conspiracy, material support, and other "offenses relating to their support for Islamist violence overseas.").

For all the USCMCR's and Judge Kavanaugh's general invocations of "national security" and the "war powers," neither explained what national security interest segregating the justice system on the basis of citizenship actually furthered. Instead, both opinions simply relied upon "generic" appeals to these interests that "are too sweeping to qualify as compelling interests." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *see also United States v. Robel*, 389 U.S. 258, 263 (1967) ("[T]he phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit."). Indeed, a Congressionally mandated limit on personal jurisdiction does nothing but tie the hands of national security officials when making forum selections in terrorism cases. How that furthers, rather than impairs, the government's ability to meet the national security interests of the United States remains unclear.

Section 948c is also not narrowly tailored to whatever compelling interest it might possibly serve. No matter how compelling the government's national security interest may be in

a given case, a citizen can never be tried before one of these military commissions, even if they are as or more culpable than an equally situated non-citizen. The law, on its face, "lays an unequal hand on those who have committed intrinsically the same quality of offense, [which is] as an invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *McLaughlin*, 379 U.S. at 194 (*quoting Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)).

Section 948c's blunt distinction between citizen and non-citizen war crime defendants is an unprecedented break with this country's military tradition. Prior to the Military Commissions Act, *every* military commission system employed throughout U.S. history has tried suspected citizen war criminals alongside non-citizens. During the Mexican War, in the first use of military commissions, hundreds of Americans were tried. *Hamdan*, 548 U.S. at 590; David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Int'l L. 5, 37 (2005). Military commissions were again used during the Civil War in which nearly every defendant was a citizen. And during the Philippine Insurrection, at least three Americans were tried for war crimes by military commissions. Glazier, 46 Va. J. Int'l L. at 52.

Even during World War II, where national security was used as a rationale for invidious discrimination, *see Korematsu v. United States*, 323 U.S. 214, 219 (1944), the United States refused to try aliens apart from non-citizens. In the military commission underlying *Ex parte Quirin*, two of the eight Nazi saboteurs were citizens, one of whom was executed, and the Supreme Court held that their status as citizens was irrelevant to their culpability as war criminals or their amenability to the personal jurisdiction of military commissions. 317 U.S. 1, 37-38, 44 (1942). And in the post-war re-codification of the laws of war, the United States embraced the principle that "Nationals, friends, enemies, all should be subject to the same rules

of procedure and judged by the same courts. There is therefore no question of setting up special tribunals to try war criminals of enemy nationality." I.C.R.C., Commentary: III Geneva Convention Relative to the Treatment of Prisoners of War 623 (1960).

Section 948c, for its part, is only the second time in U.S. history that Congress has even attempted to segregate the criminal justice system on the basis of nationality. The first was the Chinese Exclusion Acts' provision for the prosecution of non-citizen Chinese before commissioners for immigration law violations. 27 Stat. 25 (1892). The Supreme Court unanimously struck that law down because equal justice is guaranteed in this country "'without regard to any differences of race, of color, or nationality, and the equal protection of the laws is a pledge of the protection of equal laws' ... even aliens shall not be held to answer for a capital or other infamous crime unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law." *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).

While §948c's "breadth and unprecedented nature" do not alone render it invalid, they are strong indicia of the fact that it is not narrowly tailored. *See Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 168 (2002). And given that it is difficult, if not impossible, to identify what national security interest is served by segregating the federal justice system for the first time in U.S. history, the only reasonable conclusion is that §948c fails to withstand scrutiny.

> **C.     Making personal jurisdiction contingent upon citizenship status was motivated by irrational animus and the desire to avoid political accountability.**

Even if this Court concludes that rational basis scrutiny applies, §948c still fails because citizenship status is a "statutory classification" that is "clearly irrelevant to the stated purposes of

the Act." *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). The Military

Commissions Act states its purpose as to "try alien unprivileged enemy belligerents for

violations of the law of war and other offenses triable by military commission." 10 U.S.C. §

948b(a). But this statement of purpose simply begs the underlying question. To the extent the

law aims to punish enemy belligerents for violations of the law of war, the Act is unprecedented

in its underinclusiveness for the reasons stated above. "[I]f it is to be sustained," therefore, "the

challenged classification must rationally further some legitimate governmental interest other than

those specifically stated in the congressional 'declaration of policy.'" *Moreno*, 413 U.S. at 534.

If one consults the legislative history to determine the actual interest served, however, it

is clear that Congress' segregation of the defendant class was motivated by animus toward non-

citizens as a class and the desire to avoid the political accountability that would result if citizen

constituents could be tried by military commission. Rather than non-citizens' greater

dangerousness, the military commissions were designed to provide a bare minimum of

procedural due process based on the belief that Guantanamo detainees did "not deserve the same

panoply of rights preserved for American citizens in our legal system." 152 Cong. Rec. S10395

(Sept. 28, 2006) (statement of Sen. Cornyn).

Indeed, at the very same time the Military Commissions Act was in committee, the

Attorney General publicly argued that "homegrown" citizen terrorists were an equal or greater

threat than non-citizens. Remarks of the Attorney General, *Stopping Terrorists Before They

Strike: The Justice Department's Power of Prevention* (Aug. 16, 2006) *archived at*

https://perma.cc/PB7U-KGQW. Yet, the ultimate supporters of the Military Commissions Act

were candid that the law leaves this greater threat deliberately untouched:

> Let's say an American citizen has been arrested for aiding and abetting a
> terrorist, maybe even participating in a conspiracy, or maybe participating in an

action that harmed or killed American citizens. That American citizen cannot be tried in the military commission. His coconspirators could be tried in a military commission if they were an alien, but if that other coconspirator is an American citizen, they will be prosecuted under Title 18.

152 Cong. Rec. H7940 (Sept. 27, 2006) (Rep. Buyer).[8]

The legislative history also shows that Congress limited the military commissions' personal jurisdiction to non-citizens because it knew their minimal procedural protections would be viewed as unacceptable if applied to U.S. citizens[9] and limiting the defendant class to non-citizens avoided the political accountability that would result if constituents had to bear the law's burdens as well.[10]

_____

[8] *See also* 156 Cong. Rec. S3078 (May 4, 2010) (Sen. Sessions) ("I want to be sure. I think we have this matter straight. … If their actions amount to a violation of the rules of war, an alien unlawful enemy belligerent can be tried in civilian court, if we choose, or tried by a military commission. But if they are a citizen and they are caught under these circumstances, they can be detained in military custody, but they can't be tried by a military commission. They can only be tried by the civilian courts in civilian trials.").

[9] *See*, *e.g.*, 152 Cong. Rec. S10250 (Sept. 27, 2006) (Sen. Warner) ("It is wrong to say that this provision captures any U.S. citizens. It does not. It is only directed at aliens – aliens, not U.S. citizens[.]"); *id*. at S10251 (Sen. Graham) ("Under no circumstance can an American citizen be tried in a military commission. The jurisdiction of military commissions does not allow for the trial of American citizens or lawful combatants, and those who say otherwise, quite frankly, have not read the legislation because there is a prohibition to that happening."); *id*. at S10274 (Sen. Bond) ("These people are not U.S. citizens, arrested in the U.S. on some civil offense; they are, by definition, aliens engaged in or supporting terrorist hostilities against the U.S."); *id*. at S10267 (Sen. Kyl) ("This legislation has nothing to do with citizens.").

[10] *See*, *e.g.*, 152 Cong. Rec. S10,250 (daily ed. Sept. 27, 2006) (statement of Sen. Warner) ("It is wrong to say that this provision captures any U.S. citizens. It does not. It is only directed at aliens—aliens, not U.S. citizens—bomb-makers, wherever they are in the world; those who provide the money to carry out the terrorism, wherever they are—again, only aliens"); *id*. at S10,267 (statement of Sen. Kyl) ("This legislation has nothing to do with citizens."); *id*. at S10,274 (statement of Sen. Bond) ("These people are not U.S. citizens, arrested in the U.S. on some civil offense; they are, by definition, aliens engaged in or supporting terrorist hostilities against the U.S., and doing so in violation of the laws of war."); *id*. at H7544 (statement of Rep. Buyer) ("It will not apply to United States citizens."); *id*. at S10,251 (statement of Sen. Graham) ("Under no circumstance can an American citizen be tried in a military commission."); see also *The Future of Military Commissions, Hearing of the Senate Armed Services Committee* (Aug. 2, 2006) (statement of Sen. Sessions) ("And let's be sure that these extraordinary protections that we provide to American soldiers and American civilians, because we live in such a safe nation

Separate and apart from §948c's inability to withstand strict scrutiny, therefore, it fails even rational basis scrutiny because "the Constitution's guarantee of equality must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot justify disparate treatment of that group." *United States v. Windsor*, 133 S.Ct. 2675, 2693 (2013). When disparate treatment is motivated by nothing more than "animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996). This is equally true when the federal government discriminates against non-citizens. "When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 103 (1976).

This Court must accordingly be "vigilant" in guarding against such rank discrimination, which was done solely to avoid political accountability. *Cf. LSC v. Velasquez*, 531 U.S. 533, 548 (2001). Like *ex post facto* laws, invidious discrimination against disenfranchised groups fails the most basic test of rational lawmaking. "[N]othing opens the door to arbitrary action so effectively as to allow [lawmakers] to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 300 (1990) (Scalia, J., concurring). In such situations, "[o]ur salvation is the Equal Protection Clause, which requires

---

that we can take these chances and give these extra rights, that we don't give them to people who have no respect for our law and are committed to killing innocent men and women and children."); *id.* (statement of Sen. Inhofe) ("I want to make sure that we have everything in place here in Congress to make sure that the attorney-client privileges are not given to the detainees, at least not to the extent that they be to American citizens.").

the democratic majority to accept for themselves and their loved ones what they impose on you and me." *Id*.

### III.   RESPONDENTS CANNOT MEET THEIR BURDEN TO SHOW THAT THEIR MILITARY COMMISSION HAS PERSONAL JURISDICTION OVER PETITIONER.

#### A.   Military commissions' personal jurisdiction is limited to unprivileged enemy belligerents.

Personal jurisdiction under the Military Commissions Act is strictly limited to "alien unprivileged enemy belligerents," 10 U.S.C. § 948c, a statutory term of art defined in 10 U.S.C. § 948a(7). While Petitioner acknowledges he is an "alien" within the meaning of §948a(1), he is not an "unprivileged enemy belligerent." Section 948(7) defines "unprivileged enemy belligerent," not in terms of an immutable legal status, but in terms of a putative defendant's having participated in hostilities in one of three ways:

> [A]n individual (other than a privileged belligerent) who—
>
> (A) has engaged in hostilities against the United States or its coalition partners;
>
> (B) has purposefully and materially supported hostilities against the United States or its coalition partners; or
>
> (C) was a part of al Qaeda at the time of the alleged offense under this chapter.

*Ibid*. "Hostilities," in turn, is defined as a "conflict subject to the laws of war." *Id*. §948a(9).

The definition of "unprivileged enemy belligerent" is based upon the *Hamdi* plurality's definition of "enemy combatant" as someone who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) (plurality op.) (internal quotations omitted). But it is narrower than the scope of Respondents' authority under the

AUMF to detain any individual who was "part of al Qaeda, the Taliban, or associated forces at the time of his capture." *Hussain v. Obama*, 718 F.3d 964, 967 (D.C. Cir. 2013).

Instead, as the Department of Defense's Law of War Manual explains, "[u]nprivileged belligerents may generally be classified into two categories that may be distinguished from one another by the presence or absence of State authorization." Dep't of Def., Law of War Manual § 4.3.4 (2015). Those categories are state actors "who have acted so as to forfeit the privileges of combatant status by engaging in spying or sabotage" and civilians "who have, by engaging in hostilities, incurred the corresponding liabilities of combatant status." *Id*.; see also *id*. §4.2.3.3.

To demonstrate personal jurisdiction under the Military Commissions Act, therefore, Respondents bear the burden of demonstrating by a preponderance of the evidence that Petitioner not only meets the conditions for detention under the AUMF, but also that he personally "engage[d] in hostilities" in such a way as to incur the "corresponding liabilities of combatant status." This is explicit under §§ 948a(7)(A) & 948a(7)(B). And it is incorporated by reference in §948a(7)(C) by the requirement that the Petitioner was part of al Qaeda "at the time of the alleged offense under this chapter."[11] That, in turn, requires this Court to answer whether Petitioner is in fact charged with offenses triable under the Military Commissions Act. And under its punitive sections, the Military Commissions Act is clear: "An offense specified in this subchapter is triable by military commission under this chapter only if the offense is committed

---

[11] Though he does not base his present challenge to personal jurisdiction on this ground, Petitioner disputes that he was "part of al Qaeda" within the meaning of §948a(7)(C). Under the D.C. Circuit's most analogous precedents, whether an individual is "part of" al Qaeda is a "is a mixed question of law and fact." *Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010). Being "part of" al Qaeda generally involves one being a member of the organization, part of its command structure, or to have fought alongside it in combat. *Id*. at 11. Petitioner disputes that he falls into any of those categories. In fact, even under torture, Petitioner has consistently maintained that he was never a member of al Qaeda.

in the context of and associated with hostilities." 10 U.S.C. § 950p(c). In other words, personal jurisdiction is predicated upon a common threshold condition that Respondents cannot meet here: to be a "belligerent," one must have meaningfully participated in hostilities.

Petitioner, however, is not alleged to have done anything in the context of any recognized hostilities and nothing he is alleged to have done was governed by the law of war. While the charges against Petitioner are serious, he had no role in the September 11th attacks, he had no involvement in the ensuing war in Afghanistan, and none of the allegations against him relate to or took place on any recognized battlefield. The military commission therefore lacks personal jurisdiction over him because he is not an "unprivileged enemy belligerent."

### B. Respondents cannot meet their burden to show that Petitioner was engaged in any hostilities.

All of the allegations against Petitioner involve his participation in conspiracies to carry out terrorist attacks in Yemen prior to his being taken into CIA custody in Dubai in late 2002. According to all relevant evidence – statements by the political branches, germane legal enactments, and on the ground facts – Yemen was not a theater of hostilities at any time relevant to Petitioner. The earliest point in time that Yemen had been designated a theater of hostilities under the AUMF by anyone was September 19, 2003, when President Bush notified Congress, for the first time, of "military operations against al-Qaida and other international terrorists in the Horn of Africa region, including Yemen." *Letter to Congressional Leaders Reporting on Efforts in the Global War on Terrorism*, 39 Wkly. Comp. Pres. Doc. 1247 (Sept. 19, 2003). This was nearly a year after Petitioner was in U.S. custody and months after he had been named in the indictment in the Southern District of New York. By any judicially ascertainable standard, Petitioner is not alleged to have done anything in the context of and associated with hostilities that could make him a belligerent.

### 1.     Standard for determining the existence of hostilities.

In *Al Warafi v. Obama*, this Court held that, when relevant to the disposition of a habeas claim, it has the power to "decide whether active hostilities exist[.]" *Al Warafi v. Obama*, No. CV 09-2368 (RCL), 2015 WL 4600420, at *5 (D.D.C. July 30, 2015).[12] The question was presented in the case of a Guantanamo detainee who asserted that President Obama's announcement that "our combat mission in Afghanistan is over" triggered the end of hostilities in Afghanistan and consequently, mandated his release. Here, personal jurisdiction under the Military Commissions Act poses the opposite question: when and where have hostilities begun?

*Warafi* laid down two principles that are relevant here. The first is that questions respecting the existence of hostilities at particular times and places are justiciable in the context of habeas litigation. *Warafi*, 2015 WL 4600420, at *2. The second is that in determining whether hostilities exist, the Court looks to "all the relevant evidence," including but not limited to Presidential speeches. *Id*. at *6.

The principal difference between deciding when hostilities in a particular place have ended and when they began is what that evidence must show. In the absence of a formal peace treaty or repeal of a war authorization, determining when hostilities have ended depends on showing that the facts on the ground have changed so significantly that the AUMF, or similar war authorization, has been effectively "repealed or nullified." *Id*. at *7.

Determining when hostilities have begun for the purposes of domestic law, by contrast, has traditionally required one of two findings: 1) that Congress has declared war or authorized force, U.S. Const., art. I § 8, cl. 11; *Talbot v Seeman*, 1 Cranch 1, 28-29 (1801) (Marshall, C.J.) (holding that acts of Congress "can alone be resorted to [in order to determine the existence and

---

[12] While this Court's decision was vacated due to the detainee being released while his case was on appeal, Petitioner relies upon it as reflecting this Court's views on the underlying question.

scope of hostilities] ... in which case the laws of war … must be noticed."); DoD Law of War

Manual § 3.4.1.1 ("[T]he authorization by Congress of the use of military force has been

interpreted as triggering the application of certain parts of the law of war."); and/or, 2) the

President's lawful recognition that a state of hostilities exists in particular place. *The Prize*

*Cases*, 2 Black 635, 671 (1862).

Since 1973, the political branches have made these determinations within the framework

of the War Powers Resolution, 87 Stat. 555 (1973) (codified at 50 U.S.C. §§ 1541, *et seq*.). The

War Powers Resolution, in pertinent part, imposes reporting requirements whenever the

President introduces U.S. forces "1) into hostilities or into situations where imminent

involvement in hostilities is clearly indicated by the circumstances, 2) into the territory, airspace

or waters of a foreign nation, while equipped for combat, … or; 3) in numbers which

substantially enlarge United States Armed Forces equipped for combat already located in a

foreign nation." 50 U.S.C. § 1543(a). Each report articulates the nature of U.S. involvement

because the presence of U.S. forces in an area of actual or likely hostilities pursuant to

§1543(a)(1) triggers further Congressional action. *Id*. §§1544(a)-(b). To authorize the existing or

future deployment of U.S. forces, Congress passes authorizations for the use of force, which are

codified as notes to §1541.[13] When a particular geographical location becomes a confirmed

theater of actual or likely hostilities, the President submits, in turn, a War Powers Resolution

---

[13] *See*, *e.g.*, Multinational Force and Observers Participation Resolution, Pub. L. 97-132 § 7(c)
(1981) ("Sinai Resolution") (authorizing U.S. involvement in the Sinai under the War Powers
Resolution); Multinational Force in Lebanon Resolution, Pub. L. 98-119 §§ 2(b), 3, 4 (1983)
(authorizing the continued participation of U.S. forces in Lebanon under the War Powers
Resolution); Authorization for Use of Military Force Against Iraq Resolution, Pub. L. 102-1
§ 2(c) (1991) (authorizing military action against Iraq under the War Powers Resolution);
Authorization for the Use of Military Force, Pub. L. 107-40 § 2(b) (2001) (authorizing hostilities
in response to the September 11th Attacks under the War Powers Resolution); Authorization for
the Use of Military Force for Iraq, Pub. L. 107-243 § 3(c) (2002) (authorizing military operations
against Iraq under the War Powers Resolution).

report, creating a public record of that fact pursuant to §1543(a)(1).[14] Under this framework,

therefore, this Court must find that either the President or Congress identified Yemen as a theater

of hostilities at the time of its allegations against Petitioner.

Alternatively, for hostilities to exist under the law of war, the Court must find that "there

is a resort to armed force between States or protracted armed violence between governmental

authorities and organized armed groups or between such groups within a State." *Prosecutor v.

Tadić*, Case No. IT-94-1-AR72, Decision on the Defence Motion for Interlocutory Appeal on

Jurisdiction, ¶70 (ICTY App. Chamber, Oct. 2, 1995). This has been reduced to the widely

accepted "*Tadić* Test" under which the existence of hostilities depends upon: (a) the intensity of

the violence and (b) the organization of the parties. *See*, *e.g.*, THE HAGUE CONFERENCE: FINAL

REPORT ON THE MEANING OF ARMED CONFLICT IN INTERNATIONAL LAW 3 (2010) (noting that the

*Tadić* test is "widely cited for its description of the characteristics of armed conflict"); DoD Law

of War Manual § 3.4.2.2. (endorsing the *Tadić* test).

> **2.    Neither of the political branches took any action prior
> to Petitioner's arrest that would suggest that Yemen was a
> theater of hostilities.**

Following the September 11th attacks, Congress passed the Authorization for the Use of

Military Force (AUMF), 115 Stat. 224 (codified at 50 U.S.C. § 1541, *note*). The AUMF

authorized the President "to use all necessary and appropriate force against those nations,

---

[14] *See*, *e.g.*, Letter to Congress Reporting on the Deployment of U.S. Forces in the Multinational
Force and Observers, 18 Wkly. Comp. Pres. Doc. 349 (March 19, 1982) (hostilities in Lebanon);
Letter to Congressional Leaders on the Persian Gulf Conflict, 27 Wkly. Comp. Pres. Doc 59
(Jan. 18, 1991) (hostilities in Kuwait and Iraq); Letter to the Speaker of the House of
Representatives and the President Pro Tempore of the Senate, 37 Wkly. Comp. Pres. Doc. 1447
(Oct. 9, 2001) (hostilities in Afghanistan); Letter to Congressional Leaders Reporting on the
Commencement of Military Operations Against Iraq, 39 Wkly. Comp. Pres. Doc. 348 (Mar. 21,
2003) (hostilities in Iraq); Letter to Congressional Leaders Reporting on Efforts in the Global
War on Terrorism, 39 Wkly. Comp. Pres. Doc. 1247 (Sept. 19, 2003) (hostilities in Yemen under
the AUMF).

organizations, or persons" responsible for the September 11th attack. *Id*. §2(a). The AUMF

supplements and is codified as a note to the War Powers Resolution, Pub. L. 93-148, 87 Stat. 555

(codified at 50 U.S.C. §§ 1541, *et seq*.). *Id*. §2(b)(1). A few weeks later, the President notified

Congress via a War Powers Resolution report that he was initiating hostilities in Afghanistan.

*See*, *e.g*., *Letter to the Speaker of the House of Representatives and the President Pro Tempore of*

*the Senate*, 37 Wkly. Comp. Pres. Doc. 1447 (Oct. 9, 2001) (hostilities in Afghanistan).

Following the initiation of hostilities in Afghanistan, the President has drawn on the

authority of the AUMF and noticed the initiation of hostilities around the world by submitting

War Powers Resolution reports to Congress.[15] As a consequence, every court to rule on the scope

of hostilities over the past fifteen years has looked to the authority conferred by the AUMF (or

the separate authorities pertaining to the Iraq war) and the battlefields identified in War Powers

Resolution reports. *See*, *e.g*., *Hamdan*, 548 U.S. at 594 (assuming "that the AUMF activated the

President's war powers ... and that those powers include the authority to convene military

commissions in appropriate circumstances"); *Rasul v. Bush*, 542 U.S. 466, 470 (2004) ("Acting

pursuant to [the AUMF], the President sent U.S. Armed Forces into Afghanistan to wage a

military campaign against al Qaeda and the Taliban regime that had supported it."); *Meshal v.*

*Higgenbotham*, 2015 WL 6405207 *10 (D.C. Cir., Oct. 23, 2015) (Kavanaugh, J., concurring);

*United States v. Frediani*, 790 F.3d 1196, 1200 (11th Cir. 2015); *Carter v. Halliburton*, 710 F.3d

---

[15] *See*, *e.g*., Letter to Congressional Leaders Reporting on United States Efforts in the Global War on Terrorism, 39 Wkly. Comp. Pres. Doc. 246 (Mar. 20, 2003) (hostilities in Philippines under the AUMF); Letter to Congressional Leaders Reporting on Efforts in the Global War on Terrorism, 39 Wkly. Comp. Pres. Doc. 1247 (Sept. 19, 2003) (hostilities in Yemen under the AUMF); Letter to Congressional Leaders Reporting on the Deployments of United States Combat-Equipped Armed Forces Around the World, 43 Wkly. Comp. Pres. Doc. 815 (Jun. 18, 2007) (hostilities in Somalia under the AUMF); Letter to Congressional Leaders on the Global Deployment of United States Combat-Equipped Armed Forces, Daily Comp. Pres. Docs., 2015 DCPD No. 201500428 (Jun. 11, 2015) (Syria & Iraq).

171, 179 (4th Cir. 2013); *Hamdan v. United States*, 696 F.3d 1238, 1240 (D.C. Cir. 2012);

*United States v Pfluger*, 685 F.3d 481, 483 n.3 (5th Cir. 2012); *Al-Bihani*, 590 F.3d at 883.

Neither of the political branches took any action that would establish the existence of

hostilities in Yemen under the AUMF at any time relevant to the allegations against Petitioner.

Indeed, the AUMF was passed nearly a year after the bombing of the USS COLE. And in

contrast to the political branches' unequivocal invocation of the law of war after September 11,

2001, the President's response to the bombing of the USS COLE in October 2000 did nothing to

initiate hostilities or invoke the law of war. Instead, in his address to the nation, President

Clinton took for granted that the country was in peacetime:

> [E]ven when America is not at war, the men and women of our military risk
> their lives every day … No one should think for a moment that the strength of
> our military is less important in times of peace, because the strength of our
> military is a major reason we are at peace.

*The President's Radio Address*, 36 Wkly. Comp. Pres. Doc. 2464 (Oct. 14, 2000).

While presidential speeches may not be sufficient taken alone, President Clinton's

characterization of the event is corroborated by all the other relevant evidence. The President's

only War Powers Resolution report was made pursuant to §1543(a)(3), relating to the temporary

augmentation of personnel, not §1543(a)(1), relating to the presence of hostilities. *Letter to*

*Congressional Leaders Reporting on the Deployment of United States Forces in Response to the*

*Attack on the USS COLE*, 36 Wkly. Comp. Pres. Doc. 2482 (Oct. 14, 2000). The President made

clear that these additional personnel were deployed to Yemen "solely for the purpose of assisting

in on-site security ... forces will redeploy as soon as the additional security support is determined

to be unnecessary." *Ibid*.

Congress, for its part, took no legislative action that might authorize, recognize, or

initiate any hostilities in its aftermath. And no other governmental entity treated the bombing as

occurring in the context of hostilities or somehow implicating the law of war. Instead, the investigation was led by the FBI, which treated the USS COLE as a crime scene. Criminal charges arising from this investigation were brought in 2003 before a grand jury in New York, not a military tribunal. And the Navy's own investigation of the incident focused on force protection shortcomings, not combat performance, concluding that in "*performing our peacetime mission*, the Navy must always keep the security of our units and people as our foremost consideration." Chief of Naval Operations, *Investigation to Inquire into the Actions of USS COLE (DDG 67) in Preparing for and Undertaking a Brief Stop for Fuel at Bandar at Tawahi (Aden Harbor) Aden, Yemen on or about 12 October 2000* (Jan. 9, 2001) (emphasis added).

The first time Yemen was identified as a theater of hostilities by either of the political branches, such that the law of war might apply there, was the President's War Powers Resolution report of September 19, 2003. In that report, President Bush notified Congress of "military operations against al-Qaida and other international terrorists in the Horn of Africa region, including Yemen." *Letter to Congressional Leaders Reporting on Efforts in the Global War on Terrorism*, 39 Wkly. Comp. Pres. Doc. 1247 (Sept. 19, 2003). This was nearly a year after Petitioner was in custody. In the months surrounding Petitioner's arrest in Dubai, by contrast, President Bush reported to Congress twice on the deployment of U.S. personnel in Yemen and stated both times that U.S. personnel were present strictly for "training and equipping their armed forces" and "providing oversight for urban and maritime counter-terrorism training with the Yemen special operations forces." *Letter to Congressional Leaders Reporting on the Deployment of Forces in Response to the Terrorist Attacks of September 11*, 38 Wkly. Comp. Pres. Doc. 1588 (Sept. 20, 2002); *Letter to Congressional Leaders Reporting on United States Efforts in the Global War on Terrorism*, 39 Wkly. Comp. Pres. Doc. 346 (Mar. 20, 2003).

The first Congressional action recognizing any armed conflict in Yemen was not passed until November 5, 2009, when the Senate expressed concern over a rebel insurgency that it identified as having commenced in 2004. *Supporting peace, security, and innocent civilians affected by conflict in Yemen*, S. Res. 341, 111th Cong. (2009) (enacted).

And more recently, in *Al-Aulaqi v. Panetta*, Case No. 12-cv-01192-RMC (D.D.C., Jul. 18, 2012), a *Bivens* action involving a U.S. citizen killed in a drone strike in Yemen, counsel for the government defendants successfully moved to dismiss, arguing that "the U.S. government has been engaged in an armed conflict against al-Qa'ida and associated forces since 2001" and that Executive Branch designated Yemen as a theater of hostilities in 2010. *Al-Aulaqi*, Dkt. 18 at 1-2 (D.D.C., Dec. 12, 2012).

### 3. At no time relevant to Petitioner, did Yemen qualify as a theater of hostilities under the *Tadić* Test.

The "*Tadić* Test" was developed by the International Criminal Tribunal of the former Yugoslavia (ICTY) to distinguish "armed conflict" from "banditry, unorganized and short-lived insurrections, or terrorist activities, which are not subject to international humanitarian law." *Prosecutor v. Tadić*, Case No. IT- 94-1-T, Judgment, ¶ 562 (ICTY Tr. Chamber, May 7, 1997). The *Tadić* Test identifies two factors that determine the existence of hostilities subject to the laws of war: intensity of fighting and the organization of the parties. *See Prosecutor v. Tadić*, Case No. IT- 94-1-AR72, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction, ¶ 70 (ICTY App. Chamber, Oct. 2. 1995). The *Tadić* Test has become the international norm for identifying the characteristics of armed conflict.[16]

---

[16] *See, e.g.*, Rome Statute of the International Criminal Court arts. 8(2)(d), 8(2)(f), U.N. Doc. A/CONF.183/9 (July 17, 1998) art. 8(2)(f) (adopting the *Tadić* Test); Int'l Law Ass'n, The Hague Conference: Final Report on the Meaning of Armed Conflict in International Law 3

The *Tadić* distinction between "armed conflict" and other types of violence echoed

Additional Protocol II of the Geneva Conventions (APII), which was signed by the United States

in 1977 and recommended for ratification by President Reagan in 1987, but is still awaiting

approval from the Senate. Article 1 of APII similarly distinguishes armed conflicts from

"internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other

acts of a similar nature." *See* Protocol Additional to the Geneva Conventions of 12 August 1949,

and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II) art.

1, 8 June, 1977, 1125 U.N.T.S. 610. The *Tadić* Test and APII represent a self-evident

international norm – not all acts of violence or terrorism are subject to the laws of war or, as

another ICTY Tribunal later stated, "[t]he essential point made by the Trial Chamber in *Tadić* is

that isolated acts of violence, such as certain terrorist activities committed in peacetime, would

not be covered by Common Article 3." *Prosecutor v. Boškoski*, Case No. IT-04-82-T, Judgment,

¶185 (ICTY Tr. Chamber, Jul. 10, 2008).

In order to weigh the intensity of a conflict, the ICTY has identified several factors that

determine whether a conflict was intense enough for the law of war to apply, such as: the

concentration of clashes over space and time; recognition and action by the United Nations

Security Council; increases in troop levels; extent of casualties and destruction; the existence of

"front lines"; the occupation of territory, towns, and roads; and evacuation of civilian

populations from combat zones. *See Boškoski*, Case No. IT-04-82-T, Judgment ¶177 (collecting

cases). It is only when all relevant factors are considered together that an objective observer

could conclude that hostilities are intense enough to invoke the law of war.

---

(2010) (noting that the *Tadić* decision is "widely cited for its description of the characteristics of
armed conflict").

Before the attacks on September 11th, 2001 and subsequent American invasion of

Afghanistan, Respondents can point to nothing that would satisfy the intensity prong.

Respondents have in the past pointed to four events to show the existence of an armed conflict

during the pre-9/11 time period: Osama Bin Laden's 1996 *fatwa*; the 1998 Embassy Bombings in

Kenya and Tanzania; the subsequent cruise missile attack on Afghanistan; and the October 2000

USS COLE attack. But all these show is that over the course of four years, lethal violence took

place on three days. Meanwhile, the other factors listed in *Boškoski* bely any claim of intensity.

There was no seizure of territory by either side, no "front line" was developed or contested, no

civilians were forced to flee from embattled areas, no United Nations peace negotiators were

deployed, and no seizures of towns nor closures of roads occurred. Instead, at the time of the

attack on the USS COLE, it was universally understood that the United States was in a peacetime

environment and conducted itself accordingly. This is reflected in the declaration of CDR David

Glazier, USN (ret.), which states at the time of the USS COLE bombing, no forces had been

declared hostile under the Standing Rules of Engagement and there was "no change to this

peacetime status as a result of the Cole attack." (Ex. E ¶ 9).

In response to the September 11ᵗ attacks, the United States undoubtedly engaged in

hostilities in Afghanistan that would satisfy *Tadić*. However, even though the post-9/11 fighting

in Afghanistan might a temporal link to a recognizable armed conflict after September 2001,

there was no geographic link to Yemen and until at least 2003. *See Tadić*, Case No. IT-94-1-

AR72, Opinion and Judgment, ¶ 633 (holding that a charged war crime must "be linked

geographically as well as temporally with the armed conflict"). The majority of the "intensity"

factors listed in *Boškoski* are inherently geographic, such as: the deployment of government

forces to "the crisis area;" the existence and change of front lines between the parties; and the

number of civilians forced to flee from the combat zones. *See Boškoski*, Case No. IT-04-82-T, Judgment, ¶ 177.

There is no such geographic link between the battlefields of Afghanistan and the waters off the coast of Yemen. By all accounts, no belligerent of the conflict attempted to control territory, seize towns or cities, or establish a "front line" anywhere in the vicinity of Yemen. The government of Yemen was functioning and capable of exercising its own brand of justice. This is made plain by the fact that Yemeni government has already tried and sentenced Petitioner *in absentia* for his alleged role in the USS COLE bombing. When considered under all of the circumstances, no reasonable objective observer in 2000 or 2002 could conclude that Yemen was an intense, active battlefield subject to the laws of war.

With respect to the *Tadić* organizational prong, Article 1 of APII sets a very high standard in defining who can be considered an accountable party in a non-international armed conflict, applying its terms both to contracting nations and "other organized armed groups which, under responsible command, exercise such control over a part of its territory as to enable them to carry out sustained and concerted military operations and to implement this Protocol." The ICTY held in *Boškoski* that a force need not satisfy APII in order to be held accountable under Common Article 3 but it is still required to be organized enough to satisfy the *Tadić* jurisdiction. The Tribunal held that five groups of characteristics are generally considered necessary for collective violence to rise to the level of hostilities under the law of war: 1) presence of a command structure; 2) operational ability, specifically the capacity to control territory and conduct large scale military operations; 3) logistical ability such as recruitment and training capabilities; 4) discipline, specifically the ability to implement basic obligations of the Common Article 3 of the Geneva Conventions; and 5) a group's ability to negotiate with "one voice."

*Boškoski*, Case No. IT-04-82-T, Judgment, ¶¶ 199-203. The question is not whether an armed group commits acts of terrorism. It is whether their organizational structure makes them capable of complying with the Geneva Conventions. *Id*. at ¶ 205.

To satisfy the *Tadić* organizational prong, the government would have to prove these factors were present in Yemen during the relevant time period. Al-Qaeda's small size, especially in Yemen, during the relevant time and its widely dispersed structure are not indicative of an armed force but instead resemble a criminal gang.

A recognizable start to a conflict is a watershed moment in establishing the jurisdiction of any war crimes tribunal – the moment when the law of war begins to apply. The U.S. Supreme Court has recognized the importance of a conflict's beginning, holding that a war tribunal's jurisdiction exists only "so long as a state of war exists—from its declaration until peace is proclaimed." *Yamashita*, 327 U.S. at 11-12. The ICTY, for its part, has been careful to distinguish between pre-conflict escalation and the actual outbreak of hostilities that triggered the application of the law of war. In the *Haradinaj* case, the parties agreed that the beginning of the conflict was April 22, 1998, but the prosecution had indicted the accused for actions committed between March 1 and April 21, 1998. The ICTY found that although there had been "intense fighting" during those dates, the incidents did not constitute an armed conflict subject to the law of war because those acts could only be seen as "contribut[ing] to the escalation of the tension which had not yet reached the requisite level of intensity" to constitute actual hostilities. Prosecutor v. Haradinaj, Case No. IT-04-84bis-T, Retrial Judgment, ¶ 404, 410 (I.C.T.Y. Tr. Chamber, Nov. 29, 2012).

Even if it can be demonstrated that hostilities in Yemen later became a recognizable "armed conflict" under *Tadić*, it does not affect a war court's jurisdiction over pre-conflict

activities. As the ICTY recognized in *Haradinaj*, a war court may not retroactively "claw back" jurisdiction in order to encapsulate clashes that escalated tensions before the outbreak of open hostilities. *See* Laurie R. Blank & Benjamin R. Farley, *Identifying the Start of Conflict: Conflict Recognition, Operational Realities and Accountability in the Post-9/11 World*, 36 Mich. J. Int'l L. 467 (2015). Instead, the conclusion to be drawn from the ICTY cases is that intermittent acts of terrorism are not hostilities to be judged in a war court, but instead crimes to be adjudicated in regular criminal courts.

Similarly, state practice in the United States recognizes that armed violence can occur for an extended period of time before "hostilities" begin as a legal matter, as events eliciting a formal response will necessarily pre-date it.  Thus, while Fort Sumter was surrendered to Confederate soldiers on April 15, 1861, the Supreme Court later held that there was not at that time "a distinct recognition of an existing state of war." *Matthews v. McStea*, 91 U.S. 7, 12 (1875). That did not occur until the President subsequently "accord[ed] to [the Confederates] the character of belligerents" under the international law of war by proclaiming a naval blockade. *The Prize Cases*, 67 U.S. 635, 670 (1862).

What *Tadić*, its related cases, and U.S. state practice demonstrate is that at no point could any objective observer be reasonably on notice that the international laws of war were in effect in Yemen during the relevant time.

## C.    If §948c does give a military commission personal jurisdiction over Petitioner, then it is unconstitutional.

Looking to "all relevant evidence," including Respondents' previous representations to this Court, Respondents cannot meet their burden of demonstrating that hostilities existed in Yemen at any time relevant to Petitioner. He did not engage in any hostilities there. He did not

purposefully and materially support any hostilities there. And as a consequence, a military commission cannot assert personal jurisdiction over him as an "unprivileged enemy belligerent."

The only way Petitioner falls within the scope of 10 U.S.C. § 948c is if belligerent status has no identifiable temporal or geographic limits and is applicable to any individual identified as such by the Department of Defense - no matter how many years after the fact. If that is in fact what Congress intended, which is not supported by the text of the statute, Congress has exceeded its constitutional authority "in defining 'alien unprivileged enemy belligerent' in a manner that includes him[.]" *In re Al-Nashiri*, 835 F.3d at 130.

As the Supreme Court held in *Hamdan*, Respondents' "power to detain [a petitioner] for the duration of active hostilities" is distinct and constitutionally broader than its power "to try [him] and subject him to criminal punishment[.]" *Hamdan*, 548 U.S. at 635. And so whatever the scope of Respondents' authority to detain Petitioner might be, the kind of globally expansive scope of military jurisdiction asserted here, a scope that would reach criminal suspects regardless of whether "active hostilities were underway" at the times and places of their alleged crimes, would violate Article III as well as the Fifth, the Sixth, and – in capital cases – the Eighth Amendment. *Reid*, 354 U.S. at 34 (plurality op.).

Military commissions are "narrow exceptions" to the Constitution's judicial guarantees that exist only to accommodate genuine military exigencies. *Reid*, 354 U.S. at 21 (plurality op.). Military commissions have been permitted because they were the only means of dispensing swift justice in the "extraordinary circumstances" of the battlefield. *Id.* at 33; *Hamdan*, 548 U.S. at 607 (plurality op.). They allow for procedural and evidentiary shortcuts that compromise truth-finding but accommodate "the unique circumstances of the conduct of military and intelligence operations during hostilities[.]" 10 U.S.C. § 949a(b)(1); *see also* H.R. Rep. No. 109-664(I) at 2

(2006) (describing the purpose of the Military Commissions Act of 2006 as providing "standards for the admission of evidence, including hearsay evidence and other statements, which are adapted to military exigencies[.]").

Accordingly, the existence of actual hostilities when and where the alleged offense occurred has been a necessary precondition for military commissions' jurisdiction ever since the Supreme Court first clearly upheld their use during World War II. *Johnson v. Eisentrager*, 339 U.S. 763, 786 (1950); *Yamashita*, 327 U.S. at 12; *Quirin*, 317 U.S. at 35. By contrast, the prosecution of non-service members who commit offenses outside the context of hostilities, or at least in areas of military occupation associated with hostilities, has been invalidated in every case to reach the Supreme Court. *See*, *e.g.*, *McElroy v. Guagliardo*, 361 U.S. 281 (1960); *Kinsella v. Singleton*, 361 U.S. 234 (1960); *Grisham v. Hagan*, 361 U.S. 278 (1960); *Reid v. Covert*, 354 U.S. 1 (1957); *Ex parte Milligan*, 4 Wall. 1 (1866).

Of particular relevance, the Supreme Court granted pre-trial habeas relief on the precise claim raised here. When first enacted, the Uniform Code of Military Justice authorized military jurisdiction over civilians accompanying the armed forces overseas. In striking this statute down, the Court recognized that military tribunals were constitutional for offenses committed "'in the field' during time of war." *Reid*, 354 U.S. at 33. But that "extraordinary" exception for military jurisdiction, the Court held, turned on the fact that the accused was in an "area where active hostilities were under way at the time [the accused] committed their offenses[.]" *Id.* at 34. Because the petitioner's crimes had been committed outside the context of hostilities, it was "triable only by a jury in a court of law." *Id.* at 29. This was true despite international agreements and the unambiguous terms of the statute, which expressly granted the military personal jurisdiction over the petitioner. *Id.* at 16. Neither was sufficient to overcome the Constitution's

judicial trial requirements because, "the exigencies which have required military rule on the battlefront are not present in areas where no conflict exists. Military trial of civilians 'in the field' is an extraordinary jurisdiction and it should not be expanded at the expense of the Bill of Rights." *Id*. at 34.

The Supreme Court has repeatedly reaffirmed this holding on the principle that the Courts must "restrict military tribunals to the narrowest jurisdiction deemed absolutely essential" to their constitutional purpose. *Toth*, 350 U.S. at 22. Taken together with the interpretive rule that "Federal statutes are to be so construed as to avoid serious doubt of their constitutionality," *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749 (1961), this Court should, at a minimum, avoid construing §948c in a way that confers upon the Executive Branch the unreviewable discretion to seize non-citizens anywhere in the world and try them by military commission, irrespective of whether they have ever set foot in a place that either the government or the public at large would have recognized to be a war zone. *Lee v. Madigan*, 358 U. S. 228, 236 (1959) ("Congressional statutes should not be construed 'to deny soldiers or civilians the benefit of jury trials for capital offenses … [when] all hostilities had ceased. To hold otherwise would be to make substantial rights turn on a fiction. We will not presume that Congress used the words "in time of peace" … [to be] at war with common sense, destructive of civil rights, and unnecessary for realization of the balanced scheme promulgated by' Congress for military trials."). Alternatively, if this Court determines that no other construction of §948c is possible, this Court should hold that §948c is unconstitutional as applied as exceeding Congress' constitutional authority to define personal jurisdiction.

Petitioner is a criminal suspect, charged with participating in a conspiracy for which an indictment has been pending since 2003, involving an act of terrorism that occurred in a time

when and at a place where the President determined "America is not at war." In no meaningful

respect is Petitioner an "unprivileged enemy belligerent" and, as such, Respondents cannot meet

their burden to show that their military commission has personal jurisdiction over him.

### IV.   PETITIONER IS BEING DENIED HIS CONSTITUTIONAL, STATUTORY, AND REGULATORY RIGHT TO QUALIFIED COUNSEL IN A CAPITAL CASE.

The Military Commissions Act is explicit: "[T]he procedures and rules of evidence in

trials by military commission under this chapter shall include, at a minimum, the following rights

of the accused: … to be represented before a military commission in accordance with clause (i)

and, to the greatest extent practicable, by at least one additional counsel who is learned in

applicable law relating to capital cases[.]" 10 U.S.C. § 949a(b)(2)(C)(ii). Complimenting this

provision, Congress also codified a separate section stating the "Sense of Congress on Military

Commission System." 10 U.S.C. 47A § 1807. There, Congress declared, "It is the sense of

Congress that— (1) the fairness and effectiveness of the military commissions system … will

depend to a significant degree on the adequacy of defense counsel and associated resources for

individuals accused, particularly in the case of capital cases[.]" *Ibid.*

Pursuant to this unequivocal Congressional mandate, the Secretary of Defense

promulgated the Rules for Military Commissions, providing for an unqualified right to learned

counsel in all capital cases:

> In any case in which the trial counsel makes a recommendation to the convening
> authority pursuant to R.M.C. 307(d) that a charge be referred to a capital
> military commission, or in which the convening authority refers a charge to a
> capital military commission, the accused has the right to be represented in
> accordance with section (a) above, and by at least one additional counsel who is
> learned in applicable law relating to capital cases.

R.M.C. 506(b). Respondents nevertheless are now proceeding through critical stages of

Petitioner's capital case, despite the fact that the only attorney presently capable of representing

Petitioner joined the bar in 2012 and, as Col Spath himself recognized, is in no way qualified to serve as learned counsel in a capital case.

Thus far, LT Piette has accordingly declined to make any representational decisions other than to request that learned counsel be made available. LT Piette has stated repeatedly on the record that he is not competent to represent Petitioner without such assistance. And as reflected in the Declaration of Ms. Olsen-Gault, LT Piette's concerns are well-founded. "The importance of qualified representation prior to the commencement of trial is reflected in the requirement of specialized, capital-case specific skills and training in several *pre-trial* areas of practice[.] … The Guidelines explain that the early phases of a capital case are critical because counsel must, to the extent possible, begin preparing the mitigation case from the start." (Ex D, ¶¶ 20-21) (original emphasis). While Col Spath has dismissed the guidelines as "not the law," Trans. 10263, the Conference Committee report to the Military Commissions Act of 2009 specifically stated that it was the intent of Congress that the Secretary of Defense would, in promulgating the Rules for Military Commissions, "give appropriate consideration to the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (February 2003) and other comparable guidelines." H.R. Rep. No. 2647, 155 Cong. Rec. 24100 (Oct. 7, 2009). And he did. As stated above, R.M.C. 506(b) provides military commission defendants the right to learned counsel in "*any* case" in which the death penalty is sought.

Col Spath's precise reasons for allowing this case to proceed in the absence of learned counsel remain unclear. Col Spath has not memorialized his reasons in any written order. Based upon oral remarks given on the record, it appears that Col Spath is relying upon a clause within 10 U.S.C. § 949a(b)(2)(C)(ii), which states that the Secretary's rulemaking must afford Petitioner the right to learned counsel "to the greatest extent practicable[.]" Specifically, Col Spath notified

LT Piette that he intended to proceed in the absence of learned counsel because "I find learned counsel are not practicable in the near term, if ever, by the actions of General Baker." Trans. 10049 (Dkt. 278-2, at 98). When LT Piette objected to the case proceeding and declined to cross-examine a prosecution witness without learned counsel, Col Spath admonished him that he was only being tasked with "the simple direct and cross-examination of witnesses, fact witnesses and foundational witnesses. The bread and butter of law practice, the bread and butter of judge advocates[.]" Trans. 10257-58.

Petitioner has a constitutional, statutory, and regulatory right to qualified counsel at all critical stages of the capital proceedings to which he is now being subject. That includes any pre-trial proceeding in which witnesses must be examined, motions must be litigated, and evidence may be admitted. *United States v. Wade*, 388 U.S. 218, 227-288 (1967); *see also United States v. Ash*, 413 U.S. 300, 322 (1973) (Stewart, J., concurring) ("Pretrial proceedings are 'critical,' then, if the presence of counsel is essential 'to protect the fairness of the trial itself.'"); *Coleman v. Alabama*, 399 U.S. 1, 9 (1970) ("Plainly the guiding hand of counsel at the preliminary hearing is essential to protect the indigent accused against an erroneous or improper prosecution."). As Congress and the Secretary have both recognized, capital cases are qualitatively different from ordinary criminal prosecutions, not the least because they involve "trial tactics that are designed to avoid the death penalty but that have the consequence of making conviction more likely." *United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002); *see also United States v. Harper*, 729 F.2d 1216, 1223 (9th Cir. 1984). The qualifications of learned counsel are different in kind and require a type of legal judgment that a lawyer of ordinary competence simply will not possess. *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1028 (2003). As reflected in the Olson-Gault

Declaration, "Any suggestion that representation by unqualified counsel is acceptable because the case is in a pretrial posture reflects a fundamental misunderstanding of the critical nature of an attorney's work before the commencement of a capital trial." (Ex. D, ¶18.).

Col Spath has nevertheless made clear that he is content to allow Petitioner to remain effectively unrepresented throughout pre-trial proceedings, the calling of witnesses, the litigation of motions, and even throughout the trial itself, based upon his own assessment of whether the provision of qualified counsel is "practicable." Trans. 10048 (Dkt. 278-2, at 97). But Col Spath's curtailment of Petitioner's right to learned counsel, based upon his unilateral determination that providing Petitioner learned counsel was not "practicable," is wrong for at least two reasons.

*First*, and foremost, it contradicts the Secretary of Defense's judgment that such a right to learned counsel is unqualified and extends to "*any* case in which the trial counsel makes a recommendation to the convening authority pursuant to R.M.C. 307(d) that a charge be referred to a capital military commission[.]" R.M.C. 506(b) (emphasis added). Col Spath, whose legal status is the rough equivalent of an Administrative Law Judge, *cf. Landry v. F.D.I.C.*, 204 F.3d 1125, 1132 (D.C. Cir. 2000), has no authority to ignore the Secretary's rulemaking, not least to strip a capital accused of his counsel rights in a capital case.

*Second*, Col Spath's apparent belief in his authority to make unilateral practicability determinations is based upon a misreading of the relevant statute. Section 949a(b)(2)(C)(ii) is not a general statement of the accused's rights. Rather it is part of a subsection of the Military Commissions Act that gives the Secretary of Defense rulemaking authority. *Id.* §949a(a). The subsection affording Petitioner his statutory right to learned counsel is, in turn, an "Exception" to the Secretary's otherwise broad rulemaking discretion; specifying that the Secretary, in promulgating those rules, "shall include, at a minimum, the following rights of the accused,"

including the right to representation by capitally qualified counsel. To the extent that exception is

subject to any practicability qualification, it falls to the Secretary in the course of rulemaking to

make a determination of impracticability, not the military commission judge's *ad hoc* bench

orders. *Cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 620-21 (2006) (discussing UCMJ's delegation of

authority to the President to make rules for military commission that are consistent with the

UCMJ and uniform with courts-martial to the extent "practicable").

Col Spath's insistence on proceeding through multiple critical stages of Petitioner's

capital case, including but not limited to the taking of testimony and the admission of evidence,

is unlawful. The denial of qualified counsel is not simply the denial of a procedural right. It is the

denial of the single right through which "all other rights of the accused are protected." *Penson v.

Ohio*, 488 U.S. 75, 84 (1988). If there were any procedural defect that so compromised the

integrity of a criminal proceeding that a criminal defendant was certain to be prevented from

"fully defending himself," it is the denial of counsel presented here. *Al-Nashiri*, 835 F.3d at 123.

Petitioner has a right to capitally qualified counsel and habeas corpus should be granted to

prevent his being unlawfully tried without competent representation.

### V.   NONE OF THE CLAIMS PRESENTED HERE ARE SUBJECT TO THE ABSTENTION DOCTRINE ARTICULATED BY THE D.C. CIRCUIT IN *IN RE: AL-NASHIRI*.

As this Court noted on the record, the Circuit has held that equitable abstention in the

mold of *Schlesinger v. Councilman*, 420 U.S. 738 (1975), extends to certain categories of pre-

trial claims in military commission cases, such as Petitioner's previous "challenge to the military

commissions' subject-matter jurisdiction." *Al-Nashiri*, 835 F.3d at 130. Relying on *Hamdan*,

however, the Circuit suggested several categories of claims for which abstention was unlikely to

be appropriate, including: 1) that "Congress exceeded its constitutional authority in creating the

military-commission system;" 2) that Congress exceeded its constitutional authority "in defining 'alien unprivileged enemy belligerent' in a manner that includes him;" 3) that "any procedures of the system Congress created in the MCA are unconstitutional;" 4) that the military commissions' procedures "will prevent him from fully litigating his jurisdictional defense;" and 5) that "delaying habeas review … amounts to an unlawful suspension of the writ[.]" *Ibid*. And the Circuit was clear that abstention would not be appropriate for claims: 6) "that challenge his treatment while in custody;" or 7) that the "military tribunal [lacks] personal jurisdiction over the defendant." *Id*. at 130, 133.

Petitioner's first and second claims for relief both challenge personal jurisdiction. As counsel for Respondents conceded before this Court, and in numerous previous pleadings, such challenges are not subject to abstention doctrines when brought via pre-trial habeas. What is admittedly less clear is whether this Court must abstain from deciding Petitioner's third claim for relief, challenging the unlawful denial of capitally qualified counsel. This Court should not.

As a doctrinal matter, the wholesale denial of qualified defense counsel most comfortably falls within the fourth category of claims that the Circuit left open to pre-trial habeas. This category draws support from elsewhere in the Circuit's opinion, where the majority opined that abstention doctrines were generally inappropriate where a Petitioner "identified flaws in that system that would prevent him from fully litigating his defenses. Indeed, case law indicates that abstention is appropriate only where a plaintiff has 'a full and fair opportunity to litigate' his claims in the alternative forum." *Al-Nashiri*, 835 F.3d at 121, n4; *see also id*. at 123 ("In the absence of any claim that the shortcomings to which Al-Nashiri points render the congressional scheme unlawful or will prevent Al-Nashiri from fully defending himself, the district court did not err in deeming that scheme adequate."). Similarly, when construing the recognized

abstention exception for arguments that a tribunal is proceeding *ultra vires*, *Hamdan*, 548 U.S. at 589 n.20, the Circuit construed this exception as encompassing claims which "argue that the commissions created by the 2009 MCA generally lack jurisdiction over defendants because they are so procedurally deficient that they are wholly *ultra vires*." *Al-Nashiri*, 835 F.3d at 134.

When addressing this claim on Petitioner's motion for a preliminary injunction, this Court expressed concern that granting relief might open the flood gates and drag the federal courts into endless litigation over the military commissions' proceedings, frustrating the very purpose of the Circuit's abstention decision. That concern, while perhaps valid in the ordinary case, does not apply here for at least three reasons.

*First*, counsel rights are unique. If there was ever procedural deficiency that so thoroughly prevented an accused from litigating his defenses that it rendered the proceedings wholly *ultra vires*, it is the claim presented here, which affects "the most fundamental of rights." *Penson*, 488 U.S. at 84. It is unlikely that a situation as extreme as the one now presented would recur. But if it did, this Court should not feel any reluctance in preventing the military from conducting a capital trial against a man who lacks qualified counsel.

*Second*, if Petitioner is correct that he is being unlawfully denied counsel, then that procedural defect constitutes structural error. *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). Structural errors render a proceeding *ultra vires* because structural errors violate "certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017). The Supreme Court has defined structural errors as a "highly exceptional category." *United States v. Davila*, 133 S. Ct. 2139, 2149 (2013). And the number of defects that have been termed structural is so small, and such defects are so rarely

at issue, that addressing the serious claim of structural error presented here poses no risk of opening any floodgates.

*Third*, Petitioner will "suffer irreparable injury if denied equitable relief," *Younger v. Harris*, 401 U.S. 37, 44 (1971). The absence of an attorney at any critical stage of a criminal proceeding is a *per se* category of harm. "The right to have counsel provided is so fundamental that, like the admission in evidence of a coerced confession, or trial before an interested judge, the violation of the constitutional right mandates reversal 'even if no particular prejudice is shown and even if the defendant was clearly guilty.'" *United States v. Decoster*, 624 F.2d 196, 201 (D.C. Cir. 1976) quoting *Chapman v. California*, 386 U.S. 18, 43 (1967) (Stewart, J., concurring). Accordingly, "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland v. Washington*, 466 U.S. 668, 692 (1984).

Here, LT Piette fails "the threshold criteria of competence in the law" governing his representation of Petitioner. *See Solina v. United States*, 709 F.2d 160 (2d Cir. 1983). And Petitioner presently has no counsel who meet the statutory and regulatory qualifications to proceed in his case, which is no different than his having no counsel at all. LT Piette's mere presence at counsel table does not cure the fact that Petitioner remains effectively unrepresented. That is a category of *per se* injury that is irreparable, particularly in a capital case. "Time and again the [Supreme] Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case." *Caspari v. Bolden*, 510 U.S. 383, 393 (1994). When the Supreme Court first invalidated military jurisdiction over civilians, Justice Harlan concurred separately to emphasize that "[s]o far as capital cases are concerned, ... the law is especially sensitive to demands for that procedural fairness which inheres in a civilian trial[.]" *Reid*, 354 U.S. at 77 (Harlan, J., concurring).

While the military commission fails in many respects to afford the procedural fairness of a civilian trial, Congress and the Secretary of Defense have both determined that qualified counsel in capital cases is a procedural fairness that the military commissions cannot do without. Yet, that is precisely what Col Spath anticipates, not simply over the next few weeks, but through Petitioner's trial and sentencing.

Exacerbating the irreparable injuries Petitioner faces, Col Spath has repeatedly cited to *Strickland* in an apparent effort to intimidate LT Piette into proceeding despite his lack of qualifications. Should LT Piette refuse to proceed or perform deficiently under these circumstances, Col Spath has made clear his intent to characterize any deficiencies in LT Piette's performance as part of a defense "strategy" for the appellate record. Tr. 10048. Petitioner therefore will face irreparable injuries, wholly collateral to his guilt or innocence of the charges against him, solely because of a bureaucratic standoff for which he has no responsibility and no means of resolving.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner asks this honorable court to:

1.        Issue a writ of *habeas corpus* ordering that Petitioner cannot be tried before the military commission Respondents have convened to try and execute him because it lacks personal jurisdiction over him;

2.        Issue a writ of *habeas corpus* ordering that Petitioner cannot be tried before the military commission Respondents have convened to try and execute him until such time as he has been provided capitally qualified counsel to represent him;

3.        Order other such relief as this Court deems proper and just.

Respectfully submitted,

Dated: November 14, 2017          /s/      Michel Paradis
                                  Michel Paradis (D.C. Bar #499690)
                                  Kristina Hon
                                  U.S. Department of Defense
                                  Military Commission Defense Organization
                                  1620 Defense Pentagon
                                  Washington, DC 20301

                                  Nancy Hollander
                                  Freedman Boyd Hollander Goldberg
                                        Urias & Ward P.A.
                                  20 First Plaza
                                  Albuquerque, NM 87102

                                  *Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on the November 14, 2017, I caused the foregoing to be served on

Respondent's counsel by delivering four copies to the Court Security Officer pursuant to the

Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented

Information and Procedures for Counsel Access to Detainees at the United States Naval Station

in Guantanamo Bay, Cuba, in Habeas Cases Involving Top Secret/Sensitive Compartmented

Information, Case Nos. 08-MC-442-TFH (Dkt. Nos. 1481 and 1496) & 08-cv-01207-RJR (Dkt.

Nos. 79 & 80) (D.D.C. 9 January 2009).


Dated: November 14, 2017      /s/     Michel Paradis
          Michel Paradis (D.C. Bar #499690)
          U.S. Department of Defense
          Military Commission Defense Organization
          1620 Defense Pentagon
          Washington, DC 20301

          Counsel for Petitioner