UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT B

UNCLASSIFIED//FOR PUBLIC RELEASE

### Declaration of Dr. Sondra S. Crosby

1. I am a licensed physician in the Commonwealth of Massachusetts and am board certified in the specialty of Internal Medicine. I graduated from the University of Washington School of Medicine, and received my clinical training at the Boston City Hospital (now Boston Medical Center) residency program in Internal Medicine. Currently, I am an Associate Professor of Medicine and Public Health, at the Boston University Schools of Medicine and Public Health, in the Departments of Medicine, and Health Law, Bioethics, and Human Rights, and a member of the Section of General Internal Medicine at Boston Medical Center.

2. My clinical practice focuses on care of asylum seekers and refugees, most of whom have experienced torture. I have taught extensively on the medical care and evaluation of refugees and survivors of torture, and I have given invited presentations throughout the United States and internationally on various topics related to caring for survivors of torture. I have taught and mentored Istanbul Protocol evaluation and documentation in Bishkek, Kyrgyzstan; Dushanbe, Tajikistan; Istanbul, Turkey, Reyhanli, Turkey, Almaty, Kazakhstan, and Amman, Jordan as a medical consultant for Physicians for Human Rights. I have given workshops on the preparation of medical affidavits and have lectured in the Asylum Officers Basic Training Course in Lansdowne, VA on medical forensic findings in asylum cases.

3. In addition, I have published scholarly papers in *The New England Journal of Medicine, The Journal of the American Medical Association (JAMA), Annals of Internal Medicine, The British Medical Journal, The Journal of General Internal Medicine, The Laryngoscope, The British Journal of Ophthalmology,* and *Urology* among others, on my work in caring for survivors of torture.

4. I have been qualified as an expert witness in United States Immigration Court in Boston, Federal District Court for the District of Columbia, and the Military Commission Court in Guantánamo Bay, Cuba (United States v. Al-Nashiri). I have written over 300 affidavits documenting medical and psychological sequelae of torture.

5. I have evaluated and examined nearly 1000 survivors of torture in my medical practice. I am consultant to Physicians for Human Rights, and have evaluated the effects of torture, cruel, inhuman, and degrading treatment and displacement on Darfuri women living in a Refugee Camp in Chad, and former detainees in US detention at Guantánamo Bay, and at other sites in Iraq and Afghanistan. Furthermore, I have served as a medical forensic expert for the Bahrain Independent Commission of Inquiry, investigating allegations of torture.

6. I am co-founder and director of the Forensic Medical Evaluation Group, a multidisciplinary group at Boston University School of Medicine and Boston Medical Center, providing evaluation and documentation of physical and psychological evidence of torture and abuse.

7. On March 7, 2012, I was appointed by the Department of Defense as an expert in the field of internal medicine and the treatment of victims of torture to consult with defense counsel representing Abd Al-Rahim Al-Nashiri and to conduct an evaluation of Mr. Al-Nashiri's physical and mental condition.

8.   I have reviewed both classified and unclassified records including records of Mr. Al-Nashiri's treatment while in the custody of the CIA. I have met with Mr. Al-Nashiri on multiple occasions at Guantánamo Bay. I have evaluated Mr. Al-Nashiri for approximately 30 hours. My medical evaluation (physical and psychological) was based on the Istanbul Protocol, which is the international standard for the medicolegal investigation of torture.

9.   I have spoken with Barry Rosenfeld, a psychologist also employed by the Al-Nashiri defense team. Dr. Rosenfeld did a mental status evaluation of Mr. Al-Nashiri at the request of the defense.

10.  I have reviewed the publicly available findings of the military competency board that evaluated Mr. Al-Nashiri at the request of the prosecution. I concur with the competency board's findings that Mr. Al-Nashiri suffers from Post-Traumatic Stress Disorder ("PTSD") and major depression.

11.  I have also reviewed the unclassified SSCI Torture Report and the declassified CIA Inspector General Investigation, which were both released by the Government and detailed certain aspects of the CIA's Rendition, Detention, and Interrogation ("RDI") program. These reports revealed that Mr. Al-Nashiri was waterboarded, subjected to mock execution, anal rape, and other forms of torture. According to these reports, the goal of the RDI program was to induce a detainee to a state of "learned helplessness." A concept coined by experimental psychologist Dr. Martin Seligman in the 1960s, inducing "learned helplessness" consisted of restraining dogs and subjecting them to random and repeated electric shocks. Dogs that could not control or influence their suffering in any way "learned" to become helpless, collapsing into a state of passivity. Dr. Seligman found that if a researcher inflicted uncontrollable pain on a dog over a long enough period of time, the animal abandoned any attempt to escape its confinement or avoid further pain, even if given the opportunity. Mr. Al-Nashiri was in essence, broken down in the same way as the dogs in the experiments.

12.  Based on my own evaluation of the records made available to me, my conversations with Dr. Rosenfeld and my own evaluations of and conversations with Mr. Al-Nashiri personally, it is my conclusion that Mr. Al-Nashiri suffers from complex posttraumatic stress disorder as a result of extreme physical, psychological, and sexual torture inflicted upon him by the United States. In my opinion, the CIA also succeeded in inducing "learned helplessness" in Mr. Al-Nashiri. The result is that Mr. Al-Nashiri is most likely irreversibly damaged by torture that was unusually cruel and designed to break him. Indeed, in my many years of experience treating torture victims from around the world, Mr. Al-Nashiri presents as one of the most severely traumatized individuals I have ever seen. Making matters worse, there is no present effort to treat the damage, and there appear to be efforts to block others from giving him appropriate clinical care.

13.  The physical and psychological diagnoses of Mr. Al-Nashiri are compelling. One suffering from complex PTSD would be expected to be hyperviligent, suffer from intrusive recollections and flashbacks, sleep disorders, nightmares and other recognized sequalae of torture. Mr. Al-Nashiri displays every symptom of complex PTSD. He suffers chronic nightmares, the content of which, while classified, in my opinion directly relate to the specific physical, emotional and sexual torture inflicted upon Mr. Al-Nashiri while in US custody. He experiences flashbacks, which are triggered frequently by reminders of torture.

14. The torture experienced by Mr. Al-Nashiri has fractured his trust in humanity, which has damaged his ability to interact with all humans, including counsel, doctors, other detainees, and even family. While much of Mr. Al-Nashiri's treatment remains classified, there is no question that Mr. Al-Nashiri was tortured at the hands of the CIA and that his current symptoms and poor health directly relate to that torture.

15. My physical examination of Mr. Al-Nashiri strongly supported his account of torture. This examination included a detailed history of historical and current physical symptoms, in addition to examination findings, including scars. Many of his physical ailments, notably chronic pain, can be linked to torture techniques utilized during his detention.

16. Despite the passage of time between Mr. Al-Nashiri's direct torture in CIA custody and the present, he shows little sustained improvement. Although, even in the best of circumstances, the horrific and calculated nature of his torture would be expected to have long lasting effects, there are multiple factors that are unique to Guantánamo and the military proceedings against him that are further exacerbating his symptoms and suffering.

17. A principal factor in Mr. Al Nashiri's current condition is that Guantánamo itself was one of the so-called "black sites" in which Mr. Al-Nashiri was held, during his period of secret detention in the RDI program. It is difficult to overstate the pervasive consequences of this. On a periodic basis Mr. Al-Nashiri is confronted with reminders (visual, audible) of his time in CIA custody. Seeing these reminders particularly when shackled as he often is while moved to and from meetings with counsel and to court, triggers traumatic stress and causes him intense anxiety, dissociation, and painful flashbacks to his experience of torture.

18. His deterioration is exacerbated by the lack of appropriate mental health treatment at Guantánamo. Based on my assessment and vast experience caring for survivors of torture, the physical and mental health care afforded to him is woefully inadequate to his medical needs. A significant factor in my opinion is that medical professionals, including mental health care providers, have apparently been directly or indirectly instructed not to inquire into the causes of Mr. Al-Nashiri's mental distress, and as a consequence, he remains misdiagnosed and untreated. Any discussion of his experience of torture, which is the primary cause of his most chronic physical and mental ailments, appears to be off limits. I base this opinion on my review of medical records and the public testimony of "Dr. 97," who was Mr. Al-Nashiri's attending mental healthcare provider until recently. Dr. 97 changed his diagnosis of Mr. Al-Nashiri from PTSD to Narcissistic Personality Disorder shortly in advance of a hearing that involved the adequacy of Mr. Al-Nashiri's medical care. This is professionally irresponsible and is representative of the quality of mental health care that Mr. Al-Nashiri receives.

19. Lack of adequate mental health treatment is exacerbating Mr. Al-Nashiri's suffering and instability, and he continues to suffer from ongoing PTSD symptoms including somatic complaints, nightmares, hyperviligence, flashbacks, numbing, and a host of other symptoms.

20. The procedures and circumstances of the Mr. Al-Nashiri conditions of confinement and military trial process are sources of triggering events. The lack of treatment has left Mr. Al-Nashiri with out the tools necessary to self-regulate his emotional responses to triggering events that others may not perceive. Without realizing it, guards, military trial personnel and even Mr.

Al-Nashiri's defense team may do or say things that seem benign, or at least manageable in terms of their emotional valence, but which are profoundly and disproportionately upsetting to Mr. Al-Nashiri. The absence of an adequate mental health support system in Guantánamo causes each of these episodes to exacerbate Mr. Al-Nashiri's complex PTSD.

The environment in Guantánamo lacks stability or any sense of relative safety. This lack of stability profoundly exacerbates Mr. Al-Nashiri's complex PTSD. I understand from public court filings that the policies and procedures within the detention facilities are highly variable and unpredictable. This appears to be at least partially the result of an unstable command environment. Most of the detention personnel are stationed in Guantánamo for only 6 to 18 months. In addition, multiple chains of command are responsible for various aspects of his detention, the military trial process, and his health care. A key strategy of the CIA's RDI program was to keep the detention facility's policies and procedures unpredictable in order to induce helplessness. Whether deliberate or not in Guantánamo, the effect on Mr. Al-Nashiri is the same.

21. This chronic uncertainty conspires to present him with ever-changing rules and procedures, whose rationales are obscure to the point of arbitrary. While healthy adults might be able to accept that this atmosphere of uncertainty is now only incidental and a consequence of bureaucratic mismanagement, Mr. Al-Nashiri has no way of differentiating this from the government's prior deliberate efforts to destabilize his personality. Whatever the genesis of the chronic uncertainty, the effect is the same. There is an almost daily retraumatization of Mr. Al-Nashiri and no adequate mental health care to provide him the tools to deal with that.

22. At present, the military trial process is a principal driver of this instability. Rules governing hearings and how the issues will be dealt with are highly fluid and unpredictable. Moreover, the military judges have responded to defense requests pertaining to Mr. Al-Nashiri's conditions of confinement by stating that they have no power to control the various agencies that impact Mr. Al-Nashiri's well-being, such as the command that is responsible for control over the facility where Mr. Al-Nashiri is housed or the medical staff at Guantánamo. To be clear, I have no insight into the merits on any issue other than issues pertaining to Mr. Al-Nashiri's health care. However, in my opinion, the inability or unwillingness of the presiding judge to act on the merits of issues directly impacting Mr. Al-Nashiri's conditions of confinement and consequently his mental health contributes to a general atmosphere of arbitrariness that, given the stakes involved, exacerbates his trauma.

23. Given that the military trial is seeking to impose the death penalty against him, the ad hoc character of the proceedings causes Mr. Al-Nashiri profound anxiety. This anxiety is exacerbated by the fact that often his own defense counsel are typically unable explain or predict the course of the proceedings to him, to articulate applicable rules and standards, or set reasonable expectations for what will transpire. Indeed, given the ad hoc nature of the proceedings, it is unclear if or when a trial will occur.

24. One of the most destabilizing aspects of the military trial process is the lack of continuity of Mr. Al-Nashiri's defense team. Only one of his lawyers who were present at the beginning of the proceedings in 2011 remains. I understand that this is a consequence of military personnel rules. But Mr. Al-Nashiri is ill equipped to understand, let alone cope with, the loss of lawyers with whom he has developed relationships of varying degrees of trust. Particularly significant in

my opinion is the loss of CMDR Brian Mizer with whom Mr. Al-Nashiri had a particularly trusting relationship. CMDR Mizer's departure, over Nashiri's objection, is particularly damaging. He also had a relationship with Ms. Nancy Hollander, which was involuntarily severed. While other lawyers have departed with Mr. Al-Nashiri's understanding, the chronic turnover in his defense team contributes to the lack of stability in his world. This has a significantly deleterious effect on his ability to cope with circumstances and undermines his ability to trust others who claim to be helping him.

25. Another aspect of the military trial process that causes a great deal of anxiety and traumatization is his periodic exclusion from the proceedings. When the military commission goes into "closed session," not only is Mr. Al-Nashiri excluded from the courtroom, but his attorneys are prevented from explaining to him what transpires or providing specifics as to why the session was closed in the first place. This in my opinion seriously interferes with his ability to trust his attorneys. What is more, he is generally aware that sessions are closed when issues relating to his torture are being discussed. This causes him acute distress associated with his exclusion from a discussion of his own experiences.

26. In my opinion, a capital trial of Mr. Al-Nashiri in the current Military Commission regime will have a profoundly harmful and possibly long lasting effect upon him, in addition to the permanent harm already inflicted. While I would expect a capital trial in any court to be stressful, my knowledge of the more predictable procedures of federal confinement and trials causes me to believe that the contemplated military trial is stressful on a different order of magnitude and, given Mr. Al-Nashiri's situation and fragile psychological state induced by torture, exponentially more harmful.

27. Indeed, I have serious doubts about Mr. Al-Nashiri's ability remain physically or mentally capable of handling the physical and emotional stress of the military trial process. As things stand, hearings in Guantánamo have lasted no more than a few days a week, perhaps one week per month. When a trial, expected to last several months, begins and trial proceedings are held daily and particularly when issues surrounding his torture are litigated in an adversarial setting, I fear that Mr. Al-Nashiri will eventually decompensate. Without adequate mental health support and in light of the unusual and unpredictable character of the proceedings, there is a strong likelihood that this decompensation will have a permanently disabling effect on his personality and his capacity to cooperate meaningfully with his attorneys.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 24, 2015.

*Sondra Crosby M.D.*
Sondra S. Crosby, M.D